**SHARON J. BRUNNER, ESQ. (CSBN:229931)**
**LAW OFFICE OF SHARON J. BRUNNER**
Email: sharonjbrunner@yahoo.com
14393 Park Avenue, Suite 100
Victorville, CA 92392
(760) 243-9997- Telephone
(760) 843-8155- Facsimile

**JAMES S. TERRELL, ESQ. (CSBN: 170409)**
**LAW OFFICE OF JAMES S. TERRELL**
15411 Anacapa Road
Victorville, CA 92392
(760) 951-5850 – Telephone
(760) 952-1085 – Facsimile
Email: jim@talktoterrell.com

**Attorneys for PLAINTIFF**

# UNITED STATES DISTRICT COURT FOR THE

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **WILLIAM SCHELL MORTON**<br><br>    **Plaintiff,**<br><br>vs.<br><br>**COUNTY OF SAN BERNARDINO, DEPUTY KABLUYEN, DEPUTY PETERS, SERGEANT JIM EVANS AND DOES 1-10, INCLUSIVE.**<br>                **Defendants.** | **Case Number:** 5:21-cv-52<br><br>**COMPLAINT FOR DAMAGES**<br><br>1  **UNCONSTITUTIONAL SEIZURE ARREST DETENTION, 4th Amendment (42 USC 1983)**<br>2  **EXCESSIVE FORCE 4th Amendment Violation (42 USC 1983)**<br>3  **FAILURE TO SUMMON/INTERFERENCE WITH SERIOUS MEDICAL NEEDS 4th Amendment (42 USC 1983)**<br>4  **DELIBERATE INDIFFERENCE to SERIOUS NEEDS (42 USC 1983)** |

|   | 5 | **FAILURE TO PROTECT INMATE FROM HARM (42 USC 1983)** |
|---|---|---|
|   | 6 | **VIOLATION OF DUE PROCESS(42 USC 1983)** |
|   | 7 | **MONELL UNCONSTITUTIONAL POLICY AND PRACTICE (42 USC 1983)** |
|   | 8 | **FAILURE TO SUPERVISE AND TRAIN (42 USC 1983)** |
|   | 9 | **VIOLATION OF 42 U.S.C. §12132** |
|   | 10 | **VIOLATION OF 42 U.S.C. §794(a)** |

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1.    This is a 1983 Civil Rights Action and American with Disabilities and Rehabilitations Act Violations, which seeks compensatory, statutory and punitive damages against named Defendants and COUNTY (except punitive) for violating United States Constitution, U.S. Federal laws, and laws violating PLAINTIFF'S rights.

## JURISDICTION AND VENUE

2.    This Court has original jurisdiction over this action for damages under the laws under 42 U.S.C. § 1983, the United States Constitution and common law principles, to

redress a deprivation under color of State Law of rights, privileges, and immunities secured to PLAINTIFF, by said status, and by the First, Fourth, and Fourteenth Amendments of the United States Constitution, and the American Disability Act and related federal violations under 42 U.S.C. §12132 and §794(a)

3.    Pursuant to USC 28 § 1331, this Court has original jurisdiction under the Civil Rights Act 42 1983 and related common law claims pursuant to 28 USC 1331, 1343.

4.    Venue is proper in this Court because the Defendants reside in, and all incidents, events, and occurrences giving rise to this action occurred in the County of San Bernardino, California.

**PARTIES AND JURISDICTION**

5.        PLAINTIFF **WILLIAM SCHELL MORTON** ("**WILLIAM**") was, at all times herein mentioned a citizen of the United States of America and a resident of San Bernardino County over the age of 18.

6.    At all relevant times, Defendant **COUNTY OF SAN BERNARDINO** ("COUNTY") is and was a municipal corporation existing under the laws of the State of California. COUNTY is a chartered subdivision of the State of California with the capacity to be sued. COUNTY is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the San Bernardino Sheriff's Department and its agents and employees.

7.       Defendant **DEPUTY KABLUYEN,** ("**KABLUYEN**") is and was at all times mentioned herein a Deputy employed by the COUNTY OF SAN BERNARDINO. He is being sued in his individual capacity and in his official capacity as a Deputy for the COUNTY.

8.       Defendant **DEPUTY PETERS** ("**PETERS** ") is and was at all times mentioned herein a Deputy employed by the COUNTY OF SAN BERNARDINO. He is being sued in his individual capacity and in his official capacity as a Deputy for the COUNTY.

9.    The unknown named defendants, identified herein as DOES 1 through 10, include, but are not necessarily limited to, unknown Deputies, Sergeants, Lieutenants, Captains, and or other employees of Defendant San Bernardino Sheriff Department of unknown rank and title, including medical staff, registered nurses, Medical Physicians, psychologists, psychiatrists, and others, who with knowledge and information of who engaged in, assisted with, approved of, or acquiesced in the actions and misconduct described by defendants herein, resulting in the deprivation of WILLIAM'S civil rights and injuries to their person, as is described below.

10.      Said DOE Defendants additionally include unknown employees of the County of San Bernardino and the San Bernardino Sheriff Department who were supervisors who created, fostered, acquiesced, ratified and/or maintained the policies,

customs and/or practices that caused the deprivation of WILLIAM Constitutional rights and his injuries.

11.        WILLIAM is ignorant of the true names and capacities of these DOE Defendants, Does 1-10, inclusive, though all are believed to have been employed by Defendant County of San Bernardino, or Defendant San Bernardino Sheriff Department or acting in concert with Defendants and in the capacity of state actors, but allege that each such Defendant was in some manner responsible for their injuries due to their own conduct which were either intentional done or done with reckless indifference to the rights of the PLAINTIFF.

**FACTS**

12.  WILLIAM'S full name is William Schell MORTON and was 49 years old on January 11, 2019. William suffers from several mental illnesses including: Paranoid Schizophrenia, Post Traumatic Stress Disorder and has had the condition most of his adult life.

13.  On or about January 11, 2019, William's mother, Marie Adams, called 911 for assistance in transporting WILLIAM to a hospital, as he was suffering from mental illness and was possibly having a psychotic episode in dire need of emergency medical care and mental health care.

14.   WILLIAM had been recently released from Canyon Ridge Hospital which is a locked psychiatric hospital located in Chino, California, where he had been held for evaluation on a 72 hour hold. The hold was related to a concern that WILLIAM was a danger to himself or others, pursuant to Welfare and Institution Code 5150. WILLIAM was released from the facility on or around January 4, 2019, seven days earlier.

15.   Responding to the 911 request, Defendant KABLUYEN and Deputy PETERS arrived at the family residence where WILLIAM'S mother explained that WILLIAM needed to be transported to a hospital and he was suffering from mental illness. WILLIAM was suicidal and only a hospital could address his critical condition and adjust his medicine.  The reporting party went on to explain WILLIAM'S medical history, to both Defendants, Deputy KABLUYEN and PETERS.

16.   Defendant Deputy KABLUYEN, standing near PETERS, was handed the recent hospital release form with the Welfare and Institution 5150 information, including the recent release date (January 4, 2020), from Canyon Ridge Hospital. The discharge form stated that WILLIAM was on a 72 hour hold because of his attempt to end his life.

17.   DEFENDANT DEPUTY KABLUYEN asked what WILLIAM had been diagnosed with. The reporting party, Ms. Adams, explained to KABLUYEN that for years WILLIAM had suffered from paranoid schizophrenia, post traumatic stress

disorder and several other serious mental illnesses. Ms. Adams explained to KABLUYEN, and PETERS, that the danger was that WILLIAM would hurt himself, or commit suicide. KABLUYEN, PETERS were made aware of WILLIAM'S history and were presented with the discharge papers from the hospital.

18.   WILLIAM was calm and cooperative as he had not had negative contact with the police and believed that they were at his home to help him. WILLIAM requested to that he (WILLIAM) be taken to Patton State hospital.  KABLUYEN and PETERS started to harass and provoke WILLIAM by calling WILLIAM vulgar names and using expletives in raised voice.

19.   During this time the paramedics arrived to assist WILLIAM at a hospital. WILLIAM had been assisted several times in the past when he weas experiencing mental illness.

20.   The reporting party, Ms. Adams described WILLIAM'S mental illness to both KABLUYEN and PETERS. Ms. Adams specifically reported the suffering delusions, paranoia and the suffering and anguish including being delusional when he (WILLIAM) was having a "crisis." The intent of call was to get WILLIAM transportation to a facility that responds and other behaviors when WILLIAM'S suffered a crisis.

Complaint for Damages

21.   Ms. Adams explained to KABLUYEN and PETERS that WILLIAM wanted to

go to the hospital and in his rush could not open the washer/dryer to obtain his

clothing. This frustrated and confused WILLIAM who struck the washer with a

hammer. WILLIAM later apologized to his mother, who understood this incident to be

related to his mental illness. Ms. Adams relayed this information to demonstrate his

mental state and his confused state of mind and his irrational and delusional thought

process.

22.   KABLUYEN, PETERS and DOE1 asked Ms. Adams to leave and the three

entered WILLIAM'S room and instructed WILLIAM get dressed. During this time

unknown emergency medical personnel  including members of the fire department

and Defendant entered the living room.

23.    Ms. Adams heard the situation escalating, WILLIAM who was completely calm

prior to the contact with KABLUYEN, and PETERS , was now on the living room

couch and KABLUYEN had his baton drawn and raised and was screaming expletives

directly at WILLIAM. KABLUYEN was threatening WILLIAM saying, "I am going

to knock your lights out!"   Based on information and belief WILLIAM had had been

elbowed and struck by KABLUYEN, knocking him back on the couch.

24.   Ms. Adams immediately advised KABLUYEN to stop his vulgar language, and

to stop attempting to provoke WILLIAM, who needed medical help. ADAMS advised

the deputies to leave her home. Ms. Adams told KABLUYEN that he intentionally

had provoked WILLIAM and that he was supposed to be trained in how to handle

people suffering from mental illness, not escalate the situation with bullying and

vulgar abusive language.

25.   Ms. Adams was advised by PETERS that WILLIAM was being arrested and that

the deputies needed to take him to jail not to a hospital. At first WILLIAM was under

arrest for attacking a fireman, which never occurred,  One of the emergency fire

department personnel advised that this allegation of an attack was exaggerated by the

Deputies. No attack or assault occur. KABLUYEN and PETERS made the arrest on

WILLIAM for Penal Code 148 and Penal Code 594(A) Vandalism. Ms. Adams

advised the deputies that she was not reporting a vandalism.

26.   During this entire time KABLUYEN and PETERS, were present and aware of

the need for medical attention, never assisted the medical personnel, but obstructed,

interfered with allowing WILLIAM to be transported to the hospital. Despite having

knowledge of WILLIAM'S mental illness, his crisis and his emergency need of

medical/mental health, the two named Defendants decided that an arrest on two false

charges was more important than the urgent need for medical aid. The conduct of

KABLUYEN, and PETERS of arresting WILLIAM was with knowledge that they

lacked probable cause on both charges. The arrest of WILLIAM interfered with the

serious medical needs of WILLIAM despite the fact they had been provided the history and documents related to the serious nature of his illness. This action was done willfully, maliciously in response to Ms. Adam's criticism of their unprofessionalism and unnecessary excessive force.

27.   WILLIAM was handcuffed and hobbled or placed in same other restraints. Defendant PETERS, spoke to dispatch on the radio stating there was a change in plans that WILLIAM was in custody and would be taken to jail in lieu of hospital.

28.   WILLIAM was transported to San Bernardino County jail. The San Bernardino jail is currently under a consent decree for the inability to provide for prisoners suffering from medical or mental health issues. The documentation includes an admission by the COUNTY that it has in the past, presently and in the future has provided inadequate constitutional protections.

29.   KABLUYEN, and  PETERS,  transported WILLIAM to the High Desert Detention Center, and was not taken to a local hospital to deal with his medical health problem he was suffering with at the time.

30.   WILLIAM informed the High Desert Detention Center Jail staff he needed a hospital and medication. and on January 12, 2019, WILLIAM was transported to the West Valley Detention Center.  WILLIAM again informed DOES 1 and 2 was

Complaint for Damages

suffering and needed to be hospitalized for his medical/mental illness and that he posed a danger to himself and he need medicine.

31.   WILLIAM'S mother Ms. Adams, brought to the WVDC jail facility all of WILLIAM'S medicine prescriptions and explained that this medicine was urgently needed to prevent WILLIAM to cause harm to himself and to help with his symptoms. The medicine was critical DOE 3 advised that the prescriptions would be followed and filled by the medical department. This was deceptive and false. No medicine or prescription would be filled or delivered to WILLIAM.

32.   COUNTY has policies and procedures in place requiring that DOE Deputies screen each inmate for possible suicidal or danger of harm to themselves that include an intake sheet that seeks to identify individuals that suffer from physical or mental issues.

33.   WILLIAM had an extensive history of severe mental illness that would require that prior to being accepted into the jail as an inmate that a psychologist examine WILLIAM and that he would undergo a complete review before being booked as an inmate. The booking sheet requires that the deputy state the circumstance of the arrest. The circumstance of this arrest were that a call was made for the purpose of transporting WILLIAM to hospital as he was a danger to himself and needed medical assistance.

34.   The custom and practice at the COUNTY jail is to admit any individual and get the deputy back on the road. The policy may require that the proper medical personnel review and order that the pretrial detainee be sent to a hospital, the actual conduct is to admit the prisoner, despite the illness or severe injury.

35.   Despite knowing that WILLIAM suffered from Suicidal Ideation and had an urgent need for his psychotropic medicine no action was taken by DOES 3 and 4, despite the fact that they now possessed the prescriptions and the medicine names and proper dosage to save WILLIAM. No action was taken by defendant DOES 6,7, and 8, who were deputies, registered nurse, licensed family marital therapists, or medical personnel at WVDC.

36.   On or around January 21, 2019, WILLIAM did cartwheels into the toilet striking his head and causing deformity to inmate to his face and great toe, This was self-inflicted  by WILLIAM at WVDC. It is believed that WILLIAM engaged in this behavior multiple times without any intervention or action by WVDC staff.

37.   On January 27, 2019, WILLIAM, untreated and without prescribed medicine that was crucial to his existence, once again inflicted injuries on himself. Based on information and belief, WILLIAM was found standing at the cell door, covered in blood, there was an injury to his eyebrow and his forehead from pounding his head on the cell door. The fifteen-minute rounds were not effective in protecting WILLIAM.

The custom and practice of the COUNTY for individuals on a suicide watch they would be checked on every fifteen minutes. This was insufficient for WILLIAM'S condition. He needed a thorough mental health examination, medical and a constant check to prevent him suffering harm. No action was taken to get this pretrial misdemeanor inmate help by medication or removing him to mental health hospital.

38.   On February 7, 2019, based on information and belief, WILLIAM was discovered bloodied and his eyes gouged out resulting in the total blindness in one eye and injury to the other eye. WILLIAM was taken to ARMC and it was decided that a higher level of care was needed for WILLIAM.

## **FIRST CAUSE OF ACTION**

**(Unreasonable Search and Seizure-Detention and Arrest Fourth Amendment (42 USC 1983)**

**[Plaintiff v. Defendants Kabluyen and Peters]**

39.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-38 of this complaint with the same force and effect as if fully set forth herein.

40.    On January 11, 2019,  San Bernardino Deputy Defendant KABLUYEN and PETERS responded to a 911 call involving Plaintiff WILLIAM, who was suffering from a mental illness and need transportation to the hospital.

41.    Upon arrival, the reporting party, Ms. Adams (WILLIAM'S mother) explained in detailed the extensive history of her son's mental illness and his recent 72 hour hold for attempting to kill himself, seven days earlier. The reporting party explained WILLIAM was delusional and not in his right mind, and that he was not dangerous and just needed transportation to the hospital.

42.    In explaining his irrational thought process to KABLUYEN and PETERS, she explained that when the dryer did not open he (WILLIAM) struck the washer/dryer with a hammer. The purpose was to illustrate to KABLUYEN and PETERS his behavior when he suffered from a mental "crisis." Which he was experiencing at the time.

43.     WILLIAM was calm and requesting to be taken to the hospital. The paramedics were en route.

44.     KABLUYEN and PETERS started raising their voices using expletives and provoking WILLIAM. The two deputies removed WILLIAM from the couch and elbowed and struck WILLIAM, raising a baton to strike WILLIAM. KABLUYEN yelled that he would knock his lights out.

45.    The reporting party Ms. Adams, asked both deputies to leave her home as they were unprofessional, lacking training when working with the people suffering mental illness, and they had escalated the situation and attempted to create problems.

46.    Deputy PETERS announced there was a change in plans and WILLIAM would not go to the hospital, but the jail instead. WILLIAM who needed immediate medical attention, and the ambulance was present, was arrested for two misdemeanor offenses that WILLIAM obviously lacked the mental capacity to commit. The misdemeanor charge placed on WILLIAM were Penal Code 148 obstruction and Penal Code 594(a) vandalism.

47.    The vandalism was for the washer dryer, for which the owner did not seek charges. The alleged victim (Ms. Adams) stated she did not want charges filed on WILLIAM and no obstruction charges under P.C. 148 occurred as WILLIAM lacked the mental capacity.

48.    KABLUYEN and PETERS were retaliating against Ms. Adams for her criticism of their conduct. No reasonable police officer would have arrested WILLIAM and their existed no probable cause for an arrest.

49.    WILLIAM was handcuffed and hobbled and placed in a police vehicle and transported to jail. This interference was unreasonable, unlawful, and denied WILLIAM his needed medical care.

50.     When the two named Defendants engaged in the foregoing conduct, they

violated WILLIAM his right to be secure against unreasonable searched and seizures

guaranteed under the Fourth Amendment to the United States Constitution and applied

to state actors by the Fourteenth Amendment.

51.     The conduct of KABLUYEN and PETERS was willful, wanton, malicious, and

done with reckless disregard for the rights and safety of WILLIAM, and therefore of

exemplary and punitive damages to both defendants.

## SECOND CAUSE OF ACTION

**Unreasonable search and seizure-Excessive Force (42 U.S.C. §1983**

**(Against Defendants KABLUYEN and PETERS)**

52.     Plaintiff realleges and incorporates by refence all paragraphs 1-51, stated above,

as though fully set forth herein.

53.      After being dispatched to a call involving transporting a mentally ill man to the

hospital, the reporting party informed the Defendants KABLUYEN and PETERS that

the Plaintiff WILLIAM was in urgent need of hospital care, and that WILLIAM had

attempted to previously hurt himself. Both Defendants used unnecessary and

unreasonable force that a reasonable officer objectively would not use under the same

circumstances.

54.     KABLUYEN and PETERS used excessive force by knocking WILLIAM

Complaint for Damages

down, elbowing and striking him when there was no need for any force.

55.    WILLIAM remained compliant and obeyed both KABLUYEN and PETERS despite the fact that they were using expletives directed at WILLIAM, along with threats and provocation to create a violent situation.

56.    Based upon information and belief KABLUYEN and PETERS elbowed, pushed and struck a mentally ill Plaintiff who was not resisting, and was obeying all requests.

57.    KABLUYEN and PETERS attempted to provoke and threaten a citizen who was in need of help and protected under the ADA and used force (battery) causing physical and mental injury. The raising of the baton to strike a citizen seeking emergency transportation to a hospital for emergent medical or mental care was offensive and harmful.

58.    At all relevant times KABLUYEN and ROGERS were acting under color of authority of state law.

59.    The conduct of KABLUYEN and PETERS was willful, wanton, malicious, and with reckless disregard for the Safety of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages to both KABLUYEN and PETERS.

Complaint for Damages

### THIRD CAUSE OF ACTION

**Unreasonable Search and Seizure—Denial of Medical Care**

**(Plaintiff v Kabluyen and PETERS)**

60.     Plaintiff realleges and incorporates by refence all paragraphs stated above, as though fully set forth herein.

61.     After both Defendants KABLUYEN and PETERS had arrived at the residence of Ms. Adams where WILLIAM also resided, they received a detailed explanation by Ms. Adams of the diagnosis and history of WILLIAM'S mental illness, which goes back several years including his severe need to get to the hospital as he was suicidal.

62.     KABLUYEN and PETERS were both informed that approximately seven days earlier he had been discharged from the Canyon Ridge documents were shown that proved WILLIAM had attempted to kill himself. The deputies were also informed that WILLIAM has problems when he doesn't receive his medicine.

63.     WILLIAM was peaceful, calm and informed the deputies that he wanted to go to Patton State Hospital.

64.     The Defendants KABLUYEN and PETERS had knowledge about the 911 call prior to the arrival at the residence. This along with the information given to them by Ms. Adams put them in touch of and notice of WILLIAM'S serious medical illness.

65.     WILLIAM'S mother, the reporting party here, demanded that KABLUYEN and PETERS stop attempting to instigate and provoke WILLIAM, by the use of expletives

and striking WILLIAM, as this was unprofessional and escalating the situation. Ms. Adams demanded that the two defendant deputies leave her home and stop interfering with the fire department.

66.    PETERS announced that now there was a change in plans. PETERS said WILLIAM would not go to the hospital but instead go to jail. KABLUYEN and PETERS arrested WILLIAM and handcuffed him and restrained his legs, despite the fact her had not been violent.

67.    Despite the fact that WILLIAM was suffering and in obvious and serious need of critical medical care the defendants decided that they would charge William with two misdemeanor charges. The delay in medical care to WILLIAM by KABLUYEN and PETERS, caused him extreme physical and emotional pain and suffering and contributed to his injuries and damages.

68.    The delay in prompt and adequate medical care by KABLUYEN and PETERS deprived WILLIAM of his right to be secure in his person against unreasonable seizures as guaranteed to him under the Fourth Amendment to the United States Constitution  and applied to state actors by the Fourteenth Amendment.

69.    The delay in medical attention contributed to WILLIAM'S suffering and was a contributing cause of WILLIAM'S injuries to his physical and emotional distress. KABLUYEN and KELLY knew that the failure to provide timely medical treatment

to WILLIAM would result in further significant injury or unnecessary wanton

infliction of pain, but disregarded that serious medical need causing WILLIAM great

bodily harm.

70.    The conduct of KABLUYEN and PETERS was willful, wanton, malicious and

done with reckless disregard and therefore warrants the imposition of exemplary and

punitive damages to both named deputies.

71.    At all relevant times KABLUYEN and PETERS were acting under color of

state law.

**FOURTH CAUSE OF ACTION**
**[Deliberate Indifference To Serious Medical Needs 42 U.S.C. § 1983]**
**(Plaintiff v. DOES 1-10)**

72.    Plaintiff realleges all prior paragraphs of this complaint and incorporate the

same herein by this reference.

73.    Instead of the hospital, WILLIAM was transported to the High Desert

Detention Center and later to the West Valley Detention Center ("WVDC").

74.    High Desert Detention Center was not equipped to handle the serious nature of

WILLIAM'S condition. WILLIAM should have never been accepted as an inmate at

High Desert Center.

75.    Defendant DOES violated WILLIAM'S Fourteenth Amendment right to

medical Care.

76.    Defendant DOES knew that WILLIAM faced serious medical and mental

health need.

77.    Defendant DOES knew that WILLIAM suffered from Paranoid Schizophrenia and Post Traumatic Stress Disorder and other illnesses and that he needed the care of a hospital.

78.    Defendant DOES knew that WILLIAM was suicidal and that his life was in danger at all times he was at the COUNTY jail.

79.    The jail pre-screening process would identify the urgent need for the transportation of WILLIAM to a facility that could evaluate him and provide safe care.

80.    WILLIAM'S mother (Ms. Adams) contacted and physically went to the West Valley Detention Center and contacted DOE 2, believe to be a sergeant and advised DOE 2 of the urgent need to get WILLIAM his medicine. Adams explained that without the medicine WILLIAM would suffer an injury or attempt to kill himself.

81.    WILLIAM'S mother brought the actual medicine (pills) and the prescriptions to WVDC and explained the importance of the medications. Ms. Adams explained that WILLIAM needed to be transported to the hospital and had an extensive history of attempting to harm himself. Ms. Adams complained that WILLIAM was not being watched carefully enough at WVDC and was injuring himself because of the lack of medicine and monitoring.

Complaint for Damages

82.    DOE 2 stated that all of that information would be communicated to the nursing and medical staff and that the appropriate medicine would be administered to WILLIAM.

83.    WILLIAM did not receive any medicine. WILLIAM was placed on suicide watch and was placed in a padded room with jail checks every 15 minutes. This was woefully inadequate.

84.    Despite knowing that WILLIAM suffered from suicidal ideation and had an urgent need for his psychotropic medicine no action was taken by DOES 3 and 4, despite the fact that they now possessed the for WILLIAM. No action was taken by defendant DOES 6,7, and 8, who were deputies, registered nurses, licensed marital family therapists, or medical personnel at WVDC.

85.    On January 21, 2019, WILLIAM did cartwheels into the toilet striking his head and causing deformity to inmate to his face and great toe, This was self-inflicted  by WILLIAM at the WVDC. No action was taken by WVDC staff to intervene or more carefully monitor WILLIAM.

86.    On January 27, 2019, WILLIAM, untreated and without prescribed medicine that was vital to his existence, once again inflicted injuries on himself. Based on information and belief, WILLIAM was found standing at the cell door he was covered in blood, there is an injury to his eye brow and his forehead from pounding his head

Complaint for Damages

on the cell door. The fifteen-minute rounds were not effective in protecting WILLIAM.  The custom and practice of the COUNTY is suicide watch that individuals placed must be checked on every fifteen minutes checks that repeatedly fail.  No action was taken to get this pretrial misdemeanor inmate help by medication or removing him to mental health hospital.

87.   On February 7, 2019, based on information and belief, WILLIAM was discovered bloodied and his eyes gouged out resulting in the total blindness in one eye and serious injury to the other eye. WILLIAM was taken to ARMC and it was decided that a higher level of care was needed for WILLIAM.

88.   The Defendants DOES 1-5, made an intentional decision to ignore all of the information and extensive history of the mental health and the warnings that WILLIAM would harm himself, or worse, commit suicide, the jail took no action. Repeatedly, the symptoms and medical signs were present and DOES 1-5 had adequate time to analysis the situation and each time decided to take no action.

89.   The conditions of housing WILLIAM in the WVDC, knowing they were incapable of providing the needed medicine, care and expertise, placed him at substantial risk of serious harm, which manifested itself on January 21, 27 and February 7, 2019 and other dates.

90.   DOES 1-5 did not take reasonable available measures to abate or reduce the risk

of serious harm, even though a reasonable deputy, supervisor, nurse, doctor, or

psychologist would have provided medicine or provide a medical evaluation. The

decision not to provide medicine or transfer WILLIAM to a hospital was objectively

unreasonable.

91.   The decision made by DOES 1-5 caused WILLIAM'S injuries. DOES 9 and 10,

the policy makers  acted with deliberate indifference in failing to implement policies

and procedures with respect to the evaluation and treatment of inmates suffering from

mental health conditions.

92.     As a direct and proximate result of all Defendants and DOE Defendants'

deliberate indifference to WILLIAM'S serious medical need, WILLIAM experienced

physical pain, severe emotional distress, and mental anguish for days, loss of eyesight

and other damages.

93.   The conduct alleged herein caused WILLIAM to be deprived of his civil rights

that are protected under the United States Constitution which has also legally,

proximately, foreseeably and actually caused WILLIAM to suffer emotional distress,

pain and suffering and further damages according to proof at time of trial.

94.    The conduct alleged herein was done with deliberate or reckless disregard of WILLIAM'S constitutional rights; justifying and sanitary needs.an award of exemplary and punitive damages.

**FIFTH CAUSE OF ACTION**
**(Violation of Due Process (42 U.S.C. §1983)**
**(Plaintiff v. All Doe Defendants)**

95.    Plaintiff realleges all prior paragraphs of this complaint and incorporate the same herein by reference.

96.    Incarcerated persons are entitled to confinement under humane conditions which provide for their basic human needs. A prison has a duty to provide adequate and safe environment.

97.    DOE Defendants 1-5 were aware that WILLIAM was a danger to himself and needed medicine which was critical for his safety. On January 21, 2019, DOES 1-5 knew or watched as WILLIAM did three cartwheels striking his head and upper body in the toilet. WILLIAM needed help for his basic medical, mental and sanitary needs.

98.    DOES 1-5, who were aware or observed such behavior who watched through the suicide window and chose to ignore WILLIAM'S needs by failing to take him to a psychiatric hospital or attempt to get medication.

99.    The inmates under suicide watch area are only checked every 15 minutes and WILLIAM'S behavior required intense monitoring medication and a professional mental health evaluation.

100.    On January 27, 2019 it was observed that WILLIAM was covered in blood. During his custody at WVDC injured himself multiple times. WILLIAM smashed his head into the cell door. WILLIAM injured his forehead and above his brow. It was an obvious that WILLIAM intended to cause himself harm and the DOES 1-5 and decision maker 9 and 10, had ample opportunity to reflect and make a decision as to the circumstances, conditions of confinement and the medical care he was receiving.

101.    The Defendant DOES 1-5, 9 and 10, made an intentional decision to ignore the apparent danger and suffering of WILLIAM and continue with same denial of adequate health care until he gouged his eyes out on February 7, 2019.

102.    The denial of medical care and the conditions of confinement put the Plaintiff at substantial risk of suffering harm.

103.    At no time did the DOE Defendants take any reasonable steps to abate or reduce the risk of serious harm and a reasonable deputy, supervisor, nurse or doctor would have understood the high degree risk involved, and the consequences of the defendants obvious.

104.    Failing to take action and to allow WILLIAM to injure himself and suffered the Defendants caused WILLIAM'S injuries.

105.    Defendants DOES deprived  WILLIAM of a minimal civilized measure of life's necessities and were deliberately indifferent when the defendants  consciously

disregarded the condition that was known to them.

106.  The conduct alleged herein caused WILLIAM to be deprived of his civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably and actually caused WILLIAM to suffer emotional distress, pain and suffering and further damages according to proof at time of trial.

107. The conduct alleged herein was done with deliberate or reckless disregard of WILLIAM'S constitutional rights; justifying and sanitary needs.an award of exemplary and punitive damages.

**SIXTH CAUSE OF ACTION**
**Municipal Liability – Ratification (42 U.S.C. § 1983)**
**(By Plaintiff against Defendants COUNTY and SUPERVISORY DOES)**

108.   Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 107 of this Complaint with the same force and effect as if fully set forth herein.

109.   At all relevant times, DOES were acting under color of state law

110.    The acts of DOES as described above, including detaining Plaintiff without reasonable suspicion, arresting him without probable cause, shooting Plaintiff, and denying him prompt and adequate medical attention, deprived Plaintiff of his rights under the United States Constitution.

111.    Upon information and belief, a final policymaker, acting under color of law, who had final policymaking authority concerning the acts of DOES, ratified (or will ratify)  acts and the bases for them. Upon information and belief, the final policymaker knew of and specifically approved (or will specifically approve of) Defendants DOES acts, which include use of excessive force against Plaintiff as well as the unreasonable detention and arrest of Plaintiff and the denial of medical care.

112.    Upon information and belief, a final policymaker has determined (or will determine) that the acts of  were "within policy

113.    Plaintiff seeks compensatory damages for the violations of his rights, including damages for past and future medical expenses, past and future loss of earnings and decreased earning capacity, physical injuries, past and future pain and suffering, and emotional and mental distress stemming from the physical injuries.

114.    Plaintiff also seeks costs and attorney's fees under this claim.

**SEVENTH CLAIM FOR RELIEF**
**Municipal Liability – Failure to Train (42 U.S.C. § 1983)**
**(By Plaintiff against Defendants COUNTY and SUPERVISORY DOES)**

115.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 114 of this Complaint with the same force and effect as if fully set forth herein.

116.    At all relevant times, DOES and DOE DEPUTIES were acting under color of state law.

117.    The acts of Deputy KABLUYEN, Deputy PETERS, and DOES deprived Plaintiff of his rights under the United States Constitution.

118.    The training policies of Defendant COUNTY were not adequate to train officers to handle the usual and recurring situations with which they must deal.

119.    Defendant COUNTY was deliberately indifferent to the obvious consequences of its failure to train its police officers adequately. Specifically, the COUNTY failed to adequately train its officers with respect to detentions and arrests, tactics and handling citizens suffering from mental illness or related disabilities.

120.    The failure of Defendant COUNTY to provide adequate training caused the deprivation of the Plaintiff's rights by DOES; that is, the COUNTY failure to train is so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused the ultimate injury.

121.    By reason of the aforementioned acts and omissions, Plaintiff suffered serious bodily injury, pain and suffering and past and future emotional and mental distress. Accordingly, Defendants COUNTY and SUPERVISORY DOES each are liable to Plaintiff for compensatory damages under 42 U.S.C. § 1983.

122.   Plaintiff seeks compensatory damages for the violations of his rights, including damages for past and future medical expenses, past and future loss of earnings and decreased earning capacity, physical injuries, past and future pain and suffering, and emotional and mental distress stemming from the physical injuries.

123.   Plaintiff also seeks punitive damages, costs, and attorney's fees under this claim.

## EIGHTH CLAIM FOR RELIEF
### Municipal Liability – Unconstitutional Custom or Policy (42 U.S.C. § 1983)
### (Against Defendants COUNTY and SUPERVISORY DOES)

124. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 123 of this Complaint with the same force and effect as if fully set forth herein.

125. At all relevant times, the named Defendants and DOES was acting under color of state law.

126. When Deputy KABLUYEN and Deputy PETERS detained and arrested Plaintiff without reasonable suspicion or probable cause, and then denied WILLIAM timely medical attention, the named Defendant and Does acted pursuant to an expressly adopted official policy/ies or a longstanding practice(s) or custom of the Defendant COUNTY.

127.  On information and belief, reprimanded, retrained, suspended, or otherwise penalized in connection with the detention, arrest and shooting of Plaintiff.

128. Defendants COUNTY and SUPERVISORY DOES, together with other policymakers and supervisors, maintained, inter alia, the following unconstitutional customs, practices, and policies:

(a) denying medical attention; cruel treatment to mentally ill individuals

(b) Providing inadequate training regarding the treatment and recognition of mental illness;

(c) Employing and retaining (as officers) individuals such as DOES, whom Defendant COUNTY at all times material herein knew or reasonably should have known had dangerous propensities for abusing their authority and for using excessive force on citizens suffering from mental illness;

(d) Inadequately supervising, training, controlling, assigning, and disciplining COUNTY deputies, and other personnel, including DOES, who Defendant COUNTY knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits;

(e) Maintaining grossly inadequate procedures for reporting,

31

Complaint for Damages

supervising, investigating, reviewing, disciplining and

controlling misconduct by COUNTY deputies;

(f) Failing to adequately discipline County officers for the above referenced

categories of misconduct, including "slaps on the

wrist," discipline that is so slight as to be out of proportion to the

magnitude of the misconduct, and other inadequate discipline

that is tantamount to encouraging misconduct;

(g) Announcing that prisoner abuse are "within policy,"

including false arrest and abuse on mentally ill that were later determined in

court to be unconstitutional;

(h) Even when as here, Does 1-8 failed to provide medical care to mentally ill

individuals, or ignores mentally ill citizens in dire need of medical aid (i)

Encouraging, accommodating, or facilitating a "blue code of

silence," "blue shield," "blue wall," "blue curtain," "blue veil," or simply "code

of silence," pursuant to which police officers do

not report other officers' errors, misconduct, or crimes. Pursuant

to this code of silence, if questioned about an incident of

misconduct involving another officer, while following the code,

the officer being questioned will claim ignorance of the other

officers' wrongdoing;

(j) Maintaining a policy of inaction and an attitude of indifference

towards individuals with mental illnesses, including by

failing to discipline, retrain, investigate, terminate, and

recommend officers for criminal prosecution who deny medical attention.

129. By reason of the aforementioned acts and omissions, Plaintiff suffered

serious bodily injury, humiliation, pain and suffering, disfigurement, and past and

future emotional and mental distress.

130.  Defendants COUNTY and SUPERVISORY DOES, together with various

other officials, whether named or unnamed, had either actual or constructive

knowledge of the deficient policies, practices and customs alleged in the paragraphs

above. Despite having knowledge as stated above, these defendants condoned,

tolerated and through actions and inactions thereby ratified such policies. Said

defendants also acted with deliberate indifference to the foreseeable effects and

consequences of these policies with respect to the constitutional rights of Plaintiff and

other individuals similarly situated.

131. By perpetrating, sanctioning, tolerating and ratifying the outrageous

conduct and other wrongful acts, County and SUPERVISORY DOES acted with

intentional, reckless, and callous disregard for the life and constitutional rights of

Plaintiff. Furthermore, the policies, practices, and customs implemented, maintained, and still tolerated by Defendants County and SUPERVISORY DOES were affirmatively linked to and were a significantly influential force behind the injuries of Plaintiff.

132. The aforementioned unconstitutional customs, practices, and polices, in addition to the ratification of the deficient customs, practices, and policies, are evidenced by the number of numerous arrests on mentally ill and excessive force on mentally ill individuals.

133. Accordingly, Defendants COUNTY and SUPERVISORY DOES each are liable to Plaintiff for compensatory damages under 42 U.S.C. § 1983.

134. Plaintiff seeks compensatory damages for the violations of his rights, including damages for past and future medical expenses, past and future loss of earnings and decreased earning capacity, physical injuries, past and future pain and suffering, and emotional and mental distress stemming from the physical injuries.

135. Plaintiff also seeks punitive damages, costs, and attorney fees pursuant to 42 U.S.C. 1988

## NINTH CAUSE OF ACTION
**Violation of the Americans with Disability Act of 1990 42 U.S.C §12101, et seq.**
**Plaintiff v.  COUNTY**

136.   Plaintiff realleges all prior paragraphs of the complaint and incorporates the

same herein by this refence.

137.   Pursuant to 42 U.S.C. § 12132, "Subject to the provisions of this title no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to a discrimination by any such entity."

138.   Under Title II of the American with Disability Act, public entities are required to make reasonable modifications to avoid discrimination on the basis of disability. The ADA sets an affirmative requirement to act appropriately with respect to prisoners with mental disabilities.

139.   ADA creates an affirmative duty in some circumstances to provide special preferred treatment, or "reasonable accommodations"

140.   Facially neutral policies may violate the ADA when such policies unduly disabled persons., even when such policies are consistently enforced.

141.   Discrimination includes a defendant's failure to make reasonable accommodations to the needs of a disabled based on his mental health. These accommodations include specialized training of jail staff, heightened level of medical care, and diligent surveillance.

142.   Defendant COUNTY failed to make reasonable accommodations to WILLIAM'S medical needs based on his mental health. COUNTY failed to

communicate the protocol for the treatment of WILLIAM despite their knowledge that WILLIAM suffered from suicidal ideation, was attempting to hurt himself, suffered from paranoid schizophrenia, and was seeking transportation to a hospital at time of arrest.

143.    COUNTY denied WILLIAM benefits of the services, programs including a safe transfer to a hospital mental health facility which is a service or activity they provide. The failure to provide critical medical care was a denial of services based upon disability.

144.    Defendant COUNTY failed to make reasonable accommodations to WILLIAM'S based on his mental health.  Defendant COUNTY ignored WILLIAM'S signs of obvious medical distress and left him in his cell without constant observation or medical care.

145.    There was an outright denial of services when WILLIAM was exhibiting obvious symptoms of medical distress. This demonstrates that Defendants were discriminating against WILLIAM because of his disability.

146.    By engaging in the acts alleged herein, all defendants failed act with ordinary care and breached their duty of care owed to WILLIAM.

147.     COUNTY and DOES 9 and 10, were deliberately indifferent to WILLIAM'S serious medical condition. Defendants had actual knowledge of the substantial risk of

harm to WILLIAM from his diagnosed condition and they responded with deliberate indifference to his condition by failing to take the necessary steps to prevent harm to himself; failing to place him in proper medical where he could be watched with constant surveillance; providing his with proper medical care; accommodating his needs for medicine; providing him with transportation to a hospital as he was suffering in mental distress.

148.    The regulations promulgated by the Department of Justice to supplement Part A of the Title II of the ADA requires each government to conduct self-evaluation of its programs and services (or the lack thereof) related to persons with disabilities:

(a)     A public entity shall within one year of the effective date of this part evaluate its current services, policies, and practices and the effects thereof, that do not or may not meet the requirements of this part, and to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.

(b)      A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in self-evaluation process by submitting comments.

149.    Defendant County failed to conduct any self-evaluation of procedures and

training for its personnel about how to handle encounters with persons who have mental illness, or other disability.

150.    Defendant COUNTY violated WILLIAM'S clearly established rights under the ADA with deliberate indifference.

151.    The violation of WILLIAM'S rights resulted from a COUNTY policy or custom adopted or maintained with deliberate indifference.

152.    As a direct and proximate result of the Defendants' conduct as herein described, WILLIAM suffered in an amount to be determined at the time of trial.

**TENTH CAUSE OF ACTION**
**Violation of the Rehabilitation Act 29 U.S.C. 794 (a)**
**Plaintiff v. County of San Bernardino**

153.    Plaintiff realleges all prior paragraphs of this complaint and Section 504 incorporates the same herein by this refence.

154.    The Rehabilitation Act 1973 ("504") states in pertinent part, provides that "No otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance…"29 U.S.C. § 794(a)

155.    Defendant COUNTY of San Bernardino receives financial assistance as defined in 29 U.S.C. §794(b)

Complaint for Damages

156.    WILLIAM Morton was a "qualified individual with a disability" under the

Rehabilitation Act

157.    Defendant COUNTY violated the Rehabilitation Act by failing to make

reasonable accommodations as to the needs of WILLIAM, a disabled person.

158.    Defendant COUNTY was deliberately indifferent to WILLIAM'S serious

medical condition.

159.    Defendant County was aware at all times of information of WILLIAM'S

critical serious condition which had been communicated to the deputies at the first

contact and the West Valley Detention Center that had received WILLIAM'S history

and had received needed prescriptions and actual prescribed medicine.

160.    Instead of providing WILLIAM with adequate medical services and fair

treatment, County refused to provide him with medical and psychiatric care as his

condition deteriorated and he suffered irreparable harm to himself.

161.    COUNTY had actual knowledge of the substantial risk of harm to WILLIAM

from his diagnosed condition and they responded with deliberate indifference by

failing to communicate or document his condition; failing to take reasonable steps to

limit WILLIAM'S ability to hurt himself; failing to find a place where he could be

constantly watched, to provide him medical care where WILLIAM was in distress.

162.    Defendant COUNTY violated the Rehabilitation Act by failing to conduct any

self-evaluation of procedures and training for its personnel about how to handle communications with the jail regarding patients who have mental illness.

163.    Defendant COUNTY violated the Rehabilitation Act by failing to conduct any self-evaluation of procedures and training for its personnel about how to handle encounters with person(s) who have mental illness or other disability.

164.    As a direct and proximate result of the Defendant COUNTY conduct as herein described, WILLIAM suffered in the amount to be determined at the time of trial.

## **PRAYER**

WHEREFORE, PLAINTIFF pray judgment against Defendants and each of them as follows:

AS TO EACH CAUSE OF ACTION AS APPLICABLE.

1.    For General Damages according to proof;

2.    For Special damages according to proof;

3.    For Exemplary damages as provided by law; in an amount to be proved against each individual Defendant;

4.    For Attorney's Fees pursuant to under U.S.C. 1983 and 1988;

5.    Punitive damages(nongovernmental)

6.      For Costs of suit;

7.      For such other and further relief as the Court may deem proper.


Dated: 1/11/2021

                                                    /s/James Terrell
                                                    James S. Terrell
                                                    Attorney for PLAINTIFF

Dated: 1/11/2021


                                                    /s/Sharon J. Brunner
                                                    Sharon J. Brunner
                                                    Attorney for PLAINTIFF

Complaint for Damages

**JURY DEMAND**

PLAINTIFF hereby demands a trial by jury.

Dated: 1/11/2021

_____/s/James Terrell_

James S. Terrell

Attorney for PLAINTIFF

Dated: 1/11/2021

_____/s/Sharon J. Brunner_

Sharon J. Brunner

Attorney for PLAINTIFF

Complaint for Damages