LAW OFFICE OF JAMES S. TERRELL
James S. Terrell, Esq. (SBN 170409)
Email: jim@talktoterrell.com
15411 Anacapa Road
Victorville, CA 92392
Tel: (760) 951-5850; Fax: (760) 952-1085


LAW OFFICE OF SHARON J. BRUNNER
Sharon J. Brunner, Esq. (SBN 229931)
Email: sharonjbrunner@yahoo.com
14393 Park Avenue, Suite 100
Victorville, CA 92392
Tel: (760) 243-9997; Fax: (760) 843-8155

**Attorney for Plaintiffs**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM SCHELL MORTON<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN BERNARDINO, DEPUTY KABLUYEN, DEPUTY PETERS, SERGEANT JIM EVANS, and DOES 1-10, inclusive<br><br>Defendants | Case No: 5:21-cv-00052-JGB-SHK<br><br>**DECLARATION OF SHARON J. BRUNNER AND EXHIBITS**<br><br>Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgement; Declaration of Sharon J. Brunner(with Exhibits);Proposed Order; *filed concurrently herewith*] |

**DECLARATION OF SHARON J. BRUNNER**

1

I, Sharon J. Brunner declare as follows:

1.  I am an attorney licensed to practice law in the State of California and admitted to practice before this Court. I am counsel of record in the above-captioned case for Plaintiffs I have personal knowledge of the following facts and if called upon to testify thereto, could and would do so competently.

2.  I was present and assisted co-counsel, James S. Terrell at the deposition of Defendant Jarred Kabluyen, as a part of this lawsuit, on July 3, 2024. Attached as Exhibit 1 are the true and correct copies of the relevant pages from Defendant Kabluyen deposition

3.  I was present and assisted co-counsel, James S. Terrell at the deposition of Defendant Kayla Peters, as a part of this lawsuit, on June 26, 2024. Attached as Exhibit 2 are the true and correct copies of the relevant pages from Defendant Kayla Peters' deposition.

4.  Attached as Exhibit 3, the receiving screening form completed on 1/11/2019 with the bate stamps COSB00670-COSB000674, produced by County Defendants as part of their initial disclosures.

5.  I was present and assisted co-counsel, James S. Terrell at the deposition of Defendant Remus Dillig, as a part of this lawsuit, on June 14, 2024. Attached as Exhibit 4 are the true and correct copies of the relevant pages from Defendant Remus Dillig's deposition.

Declaration of Sharon J. Brunner

6.   I took the deposition of 30(b)6 PMK witness Kristin Figueroa, as a part of this lawsuit, on July 24, 2024. Attached as Exhibit 5 are the true and correct copies of the relevant pages from Kristin Figueroa's deposition.

7.   I was present and assisted co-counsel, James S. Terrell at the deposition of Defendant Emily Newton, as a part of this lawsuit, on June 14, 2014. Attached as Exhibit 6 are the true and correct copies of the relevant pages from Defendant Emily Newton's deposition.

8.   I was present and along with co-counsel James S. Terrell at the deposition of Dr. Metzner, as a part of this lawsuit, on September 5, 2024. Attached as Exhibit 7 are the true and correct copies of the relevant pages from Dr. Metzner's deposition.   The deposition was taken Defense Counsel, Mark Keifer.

9.   I was present and took the deposition of Defendant Dr. Hafizullah Azizi, as a part of this lawsuit, on August 7, 2024. Attached as Exhibit 8 are the true and correct copies of the relevant pages from Dr. Azizi deposition.

10. I am aware through my involvement in other civil rights actions that San Bernardino County has an Unconstitutional Custom and Practice with regarding to training arresting deputies to participate as required by County Policy to provide information when booking an arrestee.  Based on County policy arresting deputies are required to answer questions and sign a form or a kiosk attesting to the information provided to the Intake Nurse at Booking.

3

Declaration of Sharon J. Brunner

There has been a longstanding custom and practice of not training arresting deputies concerning the importance of this process.   I am providing a listing of cases and brief facts illustrating my contention.

11. **Jono Liebrenz v. County of San Bernardino, and DOES 1-10, 5:19-cv-1245:** This case involved Jono Liebrenz who was the brother of decedent, David Liebrenz ("Mr. Liebrenz"), who died on April 29, 2018, at the age of 30, while in custody at a San Bernardino County jail, Morongo Basin Jail/Joshua Tree ("MBJ").   The facts of that case are that on April 21, 2018, Mr. Liebrenz was arrested and detained at the property of a close friend, Ms. Wysoki who owned the property.   Mr. Liebrenz was residing on Ms. Wysoki's property in a trailer.   Ms. Wysoki by profession is a Nurse Practitioner.   During the detention and arrest Ms. Wysoki informed law enforcement of her medical expertise and her occupation and further advised the arresting deputies that Mr. Liebrenz required close monitoring as he was possibly detoxing from drug use (heroin) and needed to be placed on suicide watch due his own depression and a family history of suicide.   Ms. Wysoki indicated that Mr. Liebrenz needed to be on suicide watch given his personal history as Mr. Liebrenz' parents both had committed suicide.   The conversation lasted approximately 20 minutes as Ms. Wysoki wanted to be sure that this life-saving information was written down by the deputies with the intention that the jail would be notified of these critical issues concerning

Declaration of Sharon J. Brunner

the medical and mental health of Mr. Liebrenz.  The arresting deputy failed to report this information to the intake deputy at the MBJ.  Mr. Liebrenz was not medically suited for a Level 1 jail which does not possess 24-hour medical on site.  Mr. Liebrenz was not placed on suicide watch and committed suicide on April 29, 2018.  The County of San Bernardino deputy did not process/document the third-party information and did not relay that third party information which was consistent with the County's proclamation that it has no express policy for doing so which clearly led to the untimely death of Mr. Liebrenz.

12. **Cynthia Ames v. County of San Bernardino and DOES 1-10, 5:18-cv-01362-SJO-FFM:**   Henry Simmons ("Mr. Simmons") was the son of Cynthia Ames.  Mr. Simmons suffered from a drug addiction which started when he was hit by a car and developed a dependency on prescription medication.  On September 29, 2017, Mr. Simmons was found near a local hospital acting bizarre and a call was made to law enforcement.  During the encounter a deputy believed that Mr. Simmons was under the influence of an illegal substance and instead of taking Mr. Simmons to a hospital he first took Mr. Simmons to his mother's home.  After the deputy arrived at the home of Mr. Simmons, Mr. Simmons was unable to walk without the deputy's assistance and was shirtless and shoeless.  Upon seeing her son, Cynthia Ames and her daughter both told the deputy to take her son to the hospital

Declaration of Sharon J. Brunner

immediately as they had never seen him look so bad.  Cynthia Ames believed that the deputy would take her son to the hospital because she expressed that she was deeply concerned about his condition and had never seen her son look so gravely ill.  Instead of bringing Mr. Simmons to the hospital the deputy took Mr. Simmons to a Level 1 Jail with no medical care on site.  The deputy who arrested Mr. Simmons was aware that Mr. Simmons was under the influence of illegal drugs yet failed to notify the intake deputy of this information.  The deputy also failed to tell the intake deputy that the family members had never seen Mr. Simmons look so bad (referring to his overall condition) and that they believed he needed to be taken to the hospital immediately.  There was no one who knew Mr. Simmons better than his mother and sister and their concerns and vital information they conveyed to the arresting deputy was ignored and not communicated to jail staff.  Mr. Simmons was not placed in a sobering cell at the Level 1 jail.  Mr. Simmons was not transported to a Level II jail where medical personnel were present, and Mr. Simmons was not taken to a hospital for a pre-jail check to assure his fitness for jail.  Mr. Simmons died within hours of being arrested and placed in the MBJ.  Again, San Bernardino County has failed to implement a policy to ensure that third party information obtained from family member or third parties is communicated to the jail or medical staff.  An expert of these

Declaration of Sharon J. Brunner

matters opined that Mr. Simmons could have been saved if he was taken to a hospital.

13. **Tammy Shidler and Gary Shidler v. County of San Bernardino: Ryan Arthurton; Wayne Greer; Bill Savage; Ronald Dunbar; Brooke Flores; Michelle Hayes; Craig Hell; Jacob Tiel; Steve Wilson and DOE 10 5:19-cv-00503-AB (SHKx):** Joshua Pitts ("Mr. Pitts) died at the MBJ on March 27, 2018 at the age of 28, by taking his own life by hanging himself in his cell after being taken off suicide watch.    Mr. Pitts was arrested on March 20, 2018, and suffered from Attention-Deficit/Hyperactivity Disorder ("ADHD") bipolar disorder and paranoia.  Law enforcement was familiar with Mr. Pitts' struggles and mental health disorders as they had contact with Mr. Pitts and his family on prior occasions prior to March 20, 2018.  When Mr. Pitts was arrested, he told the arresting deputies that he wanted to kill himself.  Mr. Pitts family members informed the Defendants that Mr.  Pitts needed to be monitored carefully as he was suicidal.  Despite these medical needs and the suicidal ideation of Mr. Pitts he was left at Level I jail for significant periods of time over his seven-day incarceration with no medical or mental health staff present.   Over the course of the incarceration Mr. Pitts condition worsened.  On March 27, 2018, the day of Mr. Pitts death a family member visited Mr. Pitts at the MBJ (Level 1 Jail) and expressed concerns to the deputies at the jail about Mr. Pitts.  The family member informed the MBJ

Declaration of Sharon J. Brunner

staff that Mr. Pitts was acting delusional, acting erratic, and required continuous monitoring.  MBJ staff did not act on the information consistent with the custom and practice of San Bernardino County to not convey/relay/communicate information from a third party or family member about an inmate.  Mr. Pitts was not closely monitored; he was not transported back to a Level II jail such as West Valley Detention Center; nor was he placed back on suicide watch.   The third-party information was simply ignored, and Mr. Pitts died.

14. **Maria Stofflet, v. County of San Bernardino; 5:18-cv-00279-PSG-kk:** Betty Lozano ("Ms. Lozano") was a 34-year-old beautiful mother of two young children when she died at the HDDC on July 26, 2017.  A lawsuit was brought by her mother and her two young children through their Guardian Ad Litem.  Ms. Lozano was arrested in the afternoon on July 26, 2017, based on the suspicion of being under the influence.   Ms. Lozano was found to be partially naked and engaging in bizarre behavior such as eating raw meat at the time of her arrest.  Ms. Lozano was transported to HDDC and had to be brought in via a wheelchair with her feet being dragged on the pavement.  Ms. Lozano was brought into the jail facility in a semi-conscious condition.  Ms. Lozano was not provided with medical care, nor was she immediately screened by a nurse to evaluate her overall fitness for incarceration.  Ms. Lozano was in no condition to answer important medical and mental health

Declaration of Sharon J. Brunner

questions at intake. It is also believed that information learned in the field by the arresting deputy was not reported to the jail intake nurse. Because of all these failures, Ms. Lozano was booked and placed in the jail where she died at 8:50 p.m. on the same day she was arrested. The believed failure of the arresting deputy in not communicating vital information obtained from third parties with the intake nurse is similar to the other deaths outlined.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed this 15th day of October, 2024 at Victorville, California.

_____*/s/Sharon J. Brunner*_____
**Sharon J. Brunner**

Declaration of Sharon J. Brunner

# EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


WILLIAM SCHELL MORTON,

      Plaintiff,

   vs.                                       Case No.
                          5:21-cv-0052-JGB(SHKx)

COUNTY OF SAN BERNARDINO,

      Defendant.
_____


DEPOSITION OF

JARRED KABLUYEN

Appearing remotely in

Apple Valley, California

Wednesday, July 3, 2024

2:13 p.m.


Jennifer D. Barker, CSR No. 12168



800.211.DEPO (3376)
EsquireSolutions.com

1           DEPOSITION OF JARRED KABLUYEN

2               Wednesday, July 3, 2024

3                    * * *

4

5

6       COURT REPORTER:  Good afternoon.  Today is

7   Wednesday, July 3, 2024.  My name is Jenny Barker.

8   I'm a certified shorthand reporter in and for the

9   State of California.

10          In regard to this transcript and its

11  read-and-sign, I reserve the right to and will

12  follow the Federal Rules pertaining to read, sign,

13  and maintenance of transcripts, and I will maintain

14  the original transcript until read-and-sign has

15  taken place or the statutory time period has

16  lapsed.

17          The witness is appearing in Apple Valley,

18  California.  I am appearing remotely, and I am not

19  in the physical presence of the witness.  The

20  parties have previously agreed to the witness being

21  sworn in remotely.

22          Deputy, at this time, I'm going to swear

23  you in, if you'll please raise your right hand.

24          (Witness sworn.)

25  ///



```
 1   Apple Valley station?

 2        A   Patrol.

 3        Q   Okay.  I think generally speaking most of

 4   the questions I'm going to be asking you, unless I

 5   say different, are going to be from the date of

 6   1/11, January 11th, concerning Mr. Morton that you

 7   wrote the supplement on; is that correct?

 8        A   That's correct.

 9        Q   2019.

10            Okay.  Now, do you recall getting

11   dispatched and sent over to the residence where

12   Mr. Morton lives?

13        A   Yes.

14        Q   Okay.  Were you the primary?

15            Is there a primary and backup, or primary

16   and secondary units?

17        A   There is.

18        Q   Okay.  And who was the primary?

19        A   That would have been Peters.

20        Q   Okay.  And did you both arrive at the same

21   time?

22        A   I don't believe so.  I don't know.  I

23   believe she got there first, but I don't remember.

24        Q   Okay.  When you got there, was -- was she

25   out of her vehicle and inside the house or was she
```



```
 1              REPORTER'S CERTIFICATION

 2

 3      I, Jennifer D. Barker, a Certified Shorthand

 4 Reporter in and for the State of California, do

 5 hereby certify:

 6

 7      That the foregoing witness was by me duly

 8 sworn; that the deposition was then taken before me

 9 at the time and place herein set forth; that the

10 testimony and proceedings were reported

11 stenographically by me and later transcribed into

12 typewriting under my direction; that the foregoing

13 is a true record of the testimony and proceedings

14 taken at that time.

15

16      IN WITNESS WHEREOF, I have subscribed my name

17 this 3rd day of July, 2024.

18

19                    Jennifer D. Barker

20                    _____

21                    Jennifer D. Barker, CSR No. 12168

22

23

24

25
```



# EXHIBIT 2

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4   WILLIAM SCHELL MORTON,              )
                                        )
5                   Plaintiff,          )
                                        ) Case No.
6           vs.                         ) 5:21-cv-0052-JGB (SHKx)
                                        ) Volume I
7   COUNTY OF SAN BERNARDINO, et        )
    al.,                                )
8                                       ) Pages 1 to 91
                    Defendants.         )
9   _____)

10

11

12

13

14

15

16    REMOTE VIDEOCONFERENCED DEPOSITION OF KAYLA PETERS TORRES

17                    Remotely in California

18                  Wednesday, June 26, 2024

19

20

21

22

23

24  Reported by:
    ELIZABETH BORRELLI, CSR No. 7844, CCRR, CLR
25  JOB NO. J11420714



1          REMOTELY IN CALIFORNIA; WEDNESDAY, JUNE 26, 2024

2                         10:07 A.M.

3

4                     KAYLA PETERS TORRES,

5                  having been duly administered

6                an oath in accordance with CCP 2094,

7                was examined and testified as follows:

8                            EXAMINATION

9    BY MR. TERRELL:

10       Q.   Good morning, Ms. Torres.  Is -- is that          10:06

11   what we should call you now?  You're --

12   congratulations, you're married, and you go by

13   Torres now; is that correct?

14       A.   Yeah.  Torres, yes.

15       Q.   Torres, excuse me.  Torres, okay.               10:07

16            All right.  Just for a little background

17   here, my name is Jim Terrell.  I'm an attorney.

18   Also in the same room here with me is Sharon

19   Brunner, also an attorney, and we represent William

20   Morton in a lawsuit related to an incident that        10:07

21   occurred between his arrest of January 11th through

22   February 7th, 2019, related to his arrest and

23   incarceration at the detention center.  And in that

24   is that we're bringing a lawsuit and you're one of

25   the parties.                                            10:07



1    2'16 you were transferred to patrol.  Where were        10:19

2    you -- where were you assigned?

3         A.   Apple Valley.

4         Q.   Okay.  And had you worked in Apple Valley

5    from that point through January 11th, 2019?             10:19

6         A.   Yes.

7         Q.   Okay.  And which shift did you work say

8    around January 11th of 2019?

9         A.   I believe I was on graveyard.  The exact

10   shift, I'm not sure.                                    10:19

11        Q.   Okay.  All right.  Now, I've talked about

12   the events or the incident on January 11th of 2019.

13   If I talked to you and asked you about being

14   dispatched to a house in Apple Valley with an

15   individual that suffered from schizophrenia; do you     10:20

16   recall that?

17        A.   You would have to give me like more

18   specific details, but yes, I would --

19        Q.   Okay.

20        A.   -- recall it.                                 10:20

21        Q.   All right.  And what do you -- and we're

22   talking about -- I don't know how specific you want

23   me to get, but I could tell you the address of

24   16985 Candlewood Road in Apple Valley on January 11,

25   2019.                                                   10:20



1      A.    After we handcuffed him, we escorted him    10:37

2  to my patrol vehicle.

3      Q.    Okay.  And -- and after he was at that --

4  at any time when any of this is going on, had anyone

5  contacted you and informed you that Mr. Morton was    10:37

6  in need of getting taken to a facility to assist him

7  with the schizophrenia and mental issues?

8      A.    The mother was yelling at us to do that.

9  But again, I was not talking to her because I was

10  focused on Mr. Morton and the arrest that we just    10:38

11  made.

12      Q.    Okay.  And -- and when is the first time

13  that the mother was yelling or contacted you with

14  that information, if you can recall?

15      A.    The -- she -- she was yelling at us when    10:38

16  we arrested him, when we put handcuffs on him, but

17  Deputy Kabluyen was the main one talking to the mom

18  while I was talking to Mr. Morton.

19      Q.    Okay.  And you -- and then at that point

20  you heard that she was saying is that the reason    10:38

21  that -- she was requesting that he be taken to a

22  facility; is that right?

23      A.    I believe so.

24      Q.    During any of this time, did any sergeants

25  or other individuals show up at this -- at the home?    10:38



1      A.    We had to hobble him.                    10:41

2      Q.    Okay.  Now, during that time, is the other

3  officer went over and spoke to the mother; is that

4  right?

5      A.    I'm not sure what the other officers -- I    10:41

6  don't know if they were able to speak with her or

7  not.

8      Q.    Okay.  I thought you had described that

9  the mother was out there yelling.  You were busy

10  with Mr. Morton, right?                            10:41

11      A.    Right.  There's -- I don't remember

12  everything that happened.  I know she was outside

13  yelling, and he started kicking my door and we

14  needed to secure him so he didn't either hurt

15  himself or hurt somebody else.                    10:42

16      Q.    All right.  So during this time, you never

17  found out from the mother that she was -- had

18  requested that William be taken to -- to the

19  hospital for his mental illness; is that right?

20      A.    I did -- I remember her yelling that she    10:42

21  wanted him taken to a hospital for his mental

22  health -- what did you say, his illness?  I'm sorry.

23      Q.    Yes.  That's what I said.

24      A.    Okay.  But it's -- that's -- that's not

25  our -- our job.                                   10:42



1    Q.   That's not your job, okay.                    10:42

2    A.   Correct.

3    Q.   Now, are you aware of 5150, when an

4    individual's a threat to himself or others and he's

5    having a mental illness episode, are you familiar     10:43

6    with using a -- the California code of 5150?

7    A.   Yes.

8    Q.   Okay.  And was that taught to you when you

9    were in the academy?

10   A.   I'm sorry.  Yes.                                10:43

11   Q.   Okay.  And you yourself, how many times

12   have you ever taken an individual and proceeded and

13   arrested him on a 5150?

14   A.   It's -- it's not an arrest for a 5150

15   because it's not a crime to be 5150, but a handful    10:43

16   of times.

17   Q.   Okay.  When you say a handful, is that

18   five or less?

19   A.   Could be, yeah, five or less, I would say.

20   Q.   Okay.  Well, let's go back to -- to the       10:44

21   2019.

22        At -- at -- up to that point in 2019, in

23   January 11, how many people have you ever 5150'ed?

24   A.   I'm not sure.  I -- I would guess one to

25   three, maybe.                                        10:44



1    Q.    Okay.  All right.  And when do you have an        10:44
2    individual and you 5150 that individual, where do
3    you take them to locally, if you're here locally?
4    A.    Locally, we would -- there is no facility
5    to take them to locally unless they're having an        10:44
6    immediate medical emergency and they need to be
7    transported by ambulance.  If we are taking them in
8    our patrol car, we take them to Arrowhead Regional
9    Medical Center.
10    Q.    Okay.  And of the three time, the one to        10:44
11    three times that you used the 5150, did you end up
12    transporting that person all the way down the -- the
13    hill to a facility?
14    A.    I have taken a person to Arrowhead
15    Regional twice, and another subject, who was a        10:45
16    juvenile, to Loma Linda University.
17    Q.    Okay.  Now, in those times that you did
18    that, was that your call as a deputy or did you have
19    to have approval from the supervisor?
20    A.    That was my call as a deputy sheriff.        10:45
21    Q.    Okay.  All right.  And when you take them
22    down to those facilities, do you have to fill out a
23    statement very similar to a probable cause statement
24    for the 5150 for that institution?
25    A.    From what I remember at that time, we had        10:45



1    Q.   Okay.  Did you ever try to get any        10:51

2  background or -- or anything directly from

3  Mr. Morton's mom who had been yelling that she

4  wanted him taken him to a hospital?

5    A.   My cowork- -- I'm sorry.  My partner, the  10:51

6  other deputy, Kabluyen, was trying to speak with

7  her.

8    Q.   Okay.  And did he pass on to you the

9  information that she said?

10    A.   He -- we did have a conversation about her  10:51

11  wanting him to go to a mental heath facility because

12  she didn't want him -- she didn't want to press

13  charges on him for -- sorry, I lost the word I

14  wanted to use.  She didn't want to press charges on

15  him for damaging the washing machine.               10:51

16    Q.   Okay.  And did she tell you is that the

17  reason for the call to dispatch had nothing to do

18  with the washer, it was to get assistance for her

19  son?

20    A.   Did she say that or what?  Sorry.           10:52

21    Q.   No, I'm asking you if that's what she

22  said?

23    A.   Oh, I -- I don't remember.

24    Q.   Okay.  Do you remember going to the

25  academy and there was a lot of learning domains?  10:52

1    A.    Yep.                                              10:52

2    Q.    Okay.  And if I told you, did you -- are

3    you familiar with learning domain number 37, which

4    is people with disabilities?

5    A.    Yes.                                              10:52

6    Q.    Okay.  And do you remember being taught

7    about dealing with individuals that had mental

8    illnesses or problems, including schizophrenia?

9    A.    Yes.

10   Q.    Okay.  And do you remember being taught is   10:52

11   the way that you approach them and talk to them is a

12   little bit different than how you would talk to

13   someone else?

14   A.    Yes.

15   Q.    Okay.  And that approaching that            10:53

16   individual sometimes could be a little different

17   than approaching someone else that is not having any

18   problems?

19   A.    It could be.

20   Q.    Okay.  All right.  Were you told to --      10:53

21   that part of the domain training was to recognize

22   the causes and nature of mental illnesses is one of

23   the topics, do you recall that?

24   A.    Is -- I'm sorry.  Repeat that one more

25   time.                                                  10:53



1    detention center?                                    11:21

2        A.   I don't recall.

3        Q.   Okay.  Now, inside the jail, do you

4    remember making contact with the nurse?

5        A.   I -- I remember him being talked to by a    11:22

6    nurse, but I don't remember me specifically talking

7    to the nurse.

8        Q.   Okay.  Under your training, you've worked

9    at the detention center and you're an officer, and

10   according to your policy, you're -- you've got,       11:22

11   what, six questions to answer to the nurse when

12   you're bringing an inmate?

13       A.   I do or the person being arrested does?

14       Q.   Well, you have -- you have to tell what

15   you saw and observed, the six questions, right?       11:22

16       A.   I -- I'm not sure.

17       Q.   You don't know what the policy is?

18            MR. JOHNSON:  Objection.  Misstates

19   testimony.

20   BY MR. TERRELL:                                       11:22

21       Q.   Do you know what the policy is in taking

22   an inmate to the detention center of asking from

23   that person questions to tell the nurse?

24       A.   No, I do not.

25       Q.   Okay.  2019, on the wall or up above, were   11:22



1    there six questions that were put up there that --    11:23

2    that you read or advise the nurse of?  Did you ever

3    see that?

4          MR. JOHNSON:  Objection.  Vague as to what

5    wall you're describing.    11:23

6    BY MR. TERRELL:

7          Q.    Adjacent to the nursing area.

8          A.    I don't recall that.

9          Q.    Okay.  And right now, do you recall a

10   policy that would have advised you as the arresting    11:23

11   officer of a duty to tell the nurse information

12   about the arrestee's health and actions prior to

13   being brought to the facility?

14         A.    No, I don't recall a specific policy on

15   that.    11:23

16         Q.    Okay.  All right.  Now, there's a place

17   for you to sign when you bring in someone, the

18   arresting officer's signature, correct?

19         A.    Correct.

20         Q.    Okay.  Do you sign that?  Do you always    11:24

21   sign that when you go into the jail?

22         A.    Can you be more specific as to which form

23   you're talking about?

24         Q.    Certainly.  I sure would.  And I apologize

25   for not doing that.    11:24



1       A.    Uh-huh.                                          11:25

2       Q.    Do you see -- do you see that area?

3       A.    Yes.

4       Q.    Okay.

5             MR. JOHNSON:  Mister --                          11:25

6    BY MR. TERRELL:

7       Q.    And below that indicates an area that

8    says, "Arresting officer's signature."

9             MR. JOHNSON:  Mr. Terrell?

10            MR. TERRELL:  Yes.                               11:25

11            MR. JOHNSON:  I apologize.  Just for the

12   record, Exhibit 19, is it just this single page

13   identified by COSB00670?

14            MR. TERRELL:  Yeah, no, it's not.  I

15   believe it's three pages long on this one.           11:26

16            MR. JOHNSON:  Okay.  Okay.

17            MR. TERRELL:  Okay.

18            MR. JOHNSON:  Just so it's clear for the

19   record as to what Exhibit 19 is versus --

20            MR. TERRELL:  And I -- and I thank you       11:26

21   very much for that as well.  I'll continue to use

22   00670 as the Bates stamp.  And I thank you.

23   BY MR. TERRELL:

24      Q.    Could you just -- right now just take back

25   and take a look at this form?  Are you familiar with   11:26



1    this form at all?                                      11:26

2         A.    That form, no.

3         Q.    Okay.  You've never seen this form?

4         A.    No.

5         Q.    Okay.  And below that it indicates -- and    11:26

6    it does have your name.  It doesn't have your badge

7    number but it has your name, right?

8         A.    That is my name, yes.

9         Q.    Okay.  "Is the arresting officer aware of

10   any of the following?"  Are you familiar with these    11:26

11   questions?

12        A.    No.  That's -- this -- I've never seen

13   this form.  This looks like a nurse form.

14        Q.    Okay.  And so to you, you've never been

15   trained on this, seen this before; is that correct?    11:27

16        A.    Correct.

17        Q.    Okay.  "Is the arresting officer aware of

18   any of the following?"  Doesn't that imply that the

19   question would be asked of the arresting officer?

20        A.    It seems as though that would be questions   11:27

21   that I answered but I did not fill this form out.

22        Q.    Okay.  And illness or injuries is NA and

23   currently reason, suicide, right, that is also NA.

24   And if we can go to Bates stamp -- this is all still

25   a part of 19 -- the next page here.                    11:27



1          All right.  And these are -- this is a          11:28
2     continuation from the other one, asking the officer
3     "under the influence of drugs or alcohol," and
4     that's checked NA, correct?
5          A.   Yes, it -- it -- on the form it is checked      11:28
6     NA.
7          Q.   Okay.  And "combative, assaultive, or
8     extremely hostile behavior," he was in a hobble.
9     According to what you saw, he tried to hit a
10    fireman.  And this -- this -- you would have checked      11:28
11    yes if you'd have done this, correct?
12         A.   I don't know what I would have done
13    because I don't fill out -- this is a medical form
14    that I would not have filled out.
15         Q.   Okay.                                           11:28
16         A.   So I don't know.
17         Q.   Okay.  Did a nurse ever ask you about
18    these questions?  Did the nurse say to you,
19    "Arresting officer, did he -- was he combative?  Was
20    he under the influence?  Is he suicidal?"             11:29
21              Were you ever asked these questions?
22         A.   I don't think so.  I don't remember.
23         Q.   Well, you would know if they were asked,
24    wouldn't you?  I mean, you don't recognize these at
25    all, correct?                                          11:29



1     A.   No.  I -- like I said, I've never seen

2  this form.

3     Q.   Okay.  And you had been at the jail

4  booking people in.  It's 2019, and I forgot when we

5  got out of academy and got here, but you've been a

6  deputy for, what, four or five years at this time?

7     A.   Yes, five.

8     Q.   All right.  Okay.  And what, 100, 200

9  people you've arrested and brought into that jail by

10  that time in five years?

11     A.   I don't -- I don't know a number, but I

12  have arrested quite a few people, yes.

13     Q.   Okay.  But, I mean, it -- it --

14  definitely, if I said 100, it would definitely be in

15  that range, right, in five years?

16     A.   Could be more, could be less.  I -- I

17  don't --

18     Q.   Okay.

19     A.   -- feel comfortable putting a number on it

20  that I'm not sure about.

21     Q.   Okay.  But you're not familiar with these

22  and you're not familiar of answering any of these

23  questions with the nurse, correct?

24     A.   No, this is not a form that deputies deal

25  with.  This would be a medical form.



1   Q.   I understand that's what you're saying,        11:30
2   but I'm asking you, are you familiar even with those
3   questions coming from a nurse asking you about the
4   arrestee?
5   A.   I do not recall them asking me these          11:30
6   questions, no.
7   Q.   Okay.  Do you remember, did -- did
8   Mr. Morton ever get his finger looked at at all or
9   examined?  It was bleeding and they called the
10   firefighters.  Now that he's at the jail, did you     11:31
11   report that his hand is cut?
12   A.   I don't recall.
13   Q.   Okay.  All right.  Is there another page
14   on this?
15   Okay.  Okay.  Can we go back to the front       11:31
16   page.
17   So as of 2019 and working there for five
18   years, have you ever signed where it says "arresting
19   officer's signature" on a form like this?  I believe
20   what this is, I believe it's like at the nurses'      11:31
21   station, there's a place for you to sign?
22   A.   At the nurses' -- in the nurses office,
23   there is a -- I don't know what they're called.
24   It's like an automated signing pad and you sign that
25   they saw the nurse.  That's my understanding of what   11:32



1   STATE OF CALIFORNIA        )
                              )    ss.
2   COUNTY OF LOS ANGELES      )

3

4           I, Elizabeth Borrelli, Certified Shorthand

5   Reporter, Certificate No. 7844, for the State

6   of California, hereby certify:

7           I am the deposition officer that steno-

8   graphically recorded the testimony in the foregoing

9   deposition;

10          Prior to being examined the deponent was

11  by me first duly administered an oath;

12          The foregoing transcript is a true record

13  of the testimony given.

14

15

16

17

18

19

20                      

21

22          Elizabeth Borrelli, CSR No. 7844

23

24

25

# EXHIBIT 3



San Bernardino County SD
655 East Third Street
San Bernardino, CA 92415

4/20/2021 10:22:37 AM PDT

## RECEIVING SCREENING - Completed by: Coruna Mary Ann RN on 1/11/2019 1:54:09 AM PST

| | | |
|---|---|---|
| **Patient:** MORTON, WILLIAM SCHELL | **#:** (1901370377) | **Lang:** |
| **DOB:** 12/18/1969 (Age=51) | **Sex:** M | **Race:** WHITE |
| **Housing:** 34-1A-02-PT | **SSN#:** **HIDDEN** | **Court Date:** |
| **Status:** NOT ACTIVE | | |

- ○ Barstow Station (08)
- ○ Big Bear Station (06)
- ○ Central Detention Center (30)
- ○ Colorado River Station (10)
- ○ Glen Helen Rehabilitation Center (32)
- ◉ High Desert Detention Center (37)
- ○ Morongo Basin Station (09)
- ○ West Valley Detention Center (34)

## ARRESTING OFFICER QUESTIONS--Select and Document all that apply

Arresting Officer: K. PETERS Badge Number:

Arresting Officer's Signature

☐ Absentee Booking

Sgt. Approving Absentee Booking

Hospital

Room #

Diagnosis

## Is the arresting officer aware of any of the following?:

| | Yes | No | NA |
|---|---|---|---|
| Illness or Injuries | ☐ | ☐ | ☑ |
| Current/Recent Suicidal Ideation | ☐ | ☐ | ☑ |

MORTON, WILLIAM SCHELL (1901370377)                    COSB00670

| | Yes | No | NA |
|---|---|---|---|
| Under Influence of Drugs or Alcohol | ☐ | ☐ | ☑ |
| Combative, Assaultive or Extremely Hostile Behavior | ☐ | ☐ | ☑ |
| Treatment by Medical Personnel in the Field | ☐ | ☐ | ☑ |
| | ☐ | ☐ | ☐ |

☐ Patient Refused

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| 127 / 91 | 97.4 | 120 | 18 | 98 | NA | NA | 0 |

| Height(in) | Weight | BMI | MAP |
|---|---|---|---|
| 0 | NA | NA | 103.00 |

Current Allergies

No Known Drug Allergy

*********************************************************************************************************

**Screeners: All questions in this form must be addressed. For questions with a single checkbox, by leaving the checkbox unselected, you are documenting your conclusion that all parameters of the question are false. By selecting the checkbox, you are acknowledging a positive response to the item and further documentation must be provided in the corresponding questions and text boxes.**

*********************************************************************************************************

**URGENT ASSESSMENT--Select and Document all that apply**

☐ Pre-Jail Check

☐ Advice Given to Officer:

☐ Morongo                    ☐ Barstow                    ☐ Big Bear
☐ Needles

**Does the screener observe or is the inmate demonstrating any of the following?:**

Is the patient in need of Emergency Medical Treatment due to injury, excessive bleeding, extreme pain, or unconsciousness?

☐ Yes
☑ No

☐ hallucinating, delusional, nonsensical, unresponsive, confused, paranoid, altered mental status, or inappropriate conduct?

☐ intoxicated, in withdrawal, slurred speech, unsteady gait, stupor, tremulous, sweating, anxious, abnormal breathing or hyperventilating?

☐ voicing current or very recent suicidal thoughts?

MORTON, WILLIAM SCHELL (1901370377)                    COSB00671

☐ disoriented to person, place, time, and/or situation?

**SUBSTANCE USE ASSESSMENTS—Select and Document all that apply**

☐ History or risk of alcohol or drug withdrawal

**Provide details of type of drug, symptoms, and when withdrawal occurred:**

☐ Recent use of illegal drugs or prescription pain medications

**Provide details of drug, frequency, amount, route, and last use below**

☐ Recent use of alcohol or sedatives (benzodiazepines)

**Provide details below—history of DTs, amount per day, number of days per week, last time sober for greater than 1 week**

**Most recent alcohol, sedative, or opiate use:**

○ 5 days or less
○ 6 days or greater

Have you consumed Bath Salts or PCP?

☐ Yes
☑ No

**Provide details of the amount and last use below**

Have you consumed any other legal or illegal substance not prescribed by a licensed provider such as Cocaine, LSD or Synthetic Marijuana?

☐ Yes
☑ No

**Provide details of the amount and last use below**

**CHRONIC CONDITIONS—Select and Document all that apply**

**Neurological**

MORTON, WILLIAM SCHELL (1901370377)                    COSB00672

☐ Seizure Disorder                ☐ Stroke                ☐ CNS Impairment

**Respiratory**

☐ Asthma                ☐ COPD/Emphysema

**Cardiovascular**

☐ CAD                ☐ CHF                ☐ Valvular Disease
☐ Hypertension        ☐ Arrhythmia        ☐ Dyslipidemia

**Gastrointestinal/Hepatic**

☐ Cirrhosis            ☐ Alcohol Liver Disease        ☐ Inflammatory Bowel Disease

**Endocrine**

☐ Insulin Dependent Diabetes    ☐ Non-Insulin Dependent Diabetes    ☐ Thyroid Disease

**Hematology/Oncology**

☐ Anemia              ☐ Cancer            ☐ Bleeding or Coagulation Disorders
☐ Sickle Cell Disease

**Infectious Disease**

☐ HIV/AIDS            ☐ Tuberculosis      ☐ Hepatitis B

**Chronic Care - Other/Miscellaneous**

☐ Kidney Disease      ☐ Transplant        ☐ Other Chronic Care

**GENERAL MEDICAL ASSESSMENTS--Select and Document all that apply**

☑ Current medications or treatments

Current Medications:

☐ Yes
☑ No

| Medication | Strength | Filling Pharmacy | Address | Phone Number | Frequency | Last Dose | Last Fill Date |
|---|---|---|---|---|---|---|---|

Current Treatments:

" I TAKE I SEROQUEL 100 MGS."

☐ Recent medical hospitalizations

☐ Active infections or contagious illnesses

☐ General-fever, lethargy, weight loss, loss of appetite, night sweats

- ☐ Skin-Lesions, needle marks, abscesses, bruises, rash, jaundice, lice, trauma, scars, tattos
- ☐ Pulmonary-Persistent cough, coughing up blood
- ☐ Urgent dental issues requiring Dentist Sick Call appointment
- ☐ Head injuries, motor vehicle/traffic accident, fight or fainting/passing out in the last 72 hours
- ☐ Visual Impairment (red band) white cane, glasses
- ☐ Hearing Impairment (white band) hearing aid, written communication, TTY, sign language
- ☐ Physical Impairment (blue band) wheelchair, crutches, cane, walkers
- ☐ Medical Diagnosis (yellow band) pregnant, seizures, diabetes, etc
- ☐ Developmental Disabilities (grey band)

Are you interested in STD testing?

- ☐ Yes
- ☑ No

HIV

- ☐ Yes
- ☐ No

Syphilis

- ☐ Yes
- ☐ No

GC/Chlamydia

- ☐ Yes
- ☐ No

**GENERAL MENTAL HEALTH ASSESSMENTS--Select and Document all that apply**

**Mental Health History**

- ☐ Current or Past Treatment for mental health issues

**List diagnosis, location, when it occurred, and what treatments below**

- ☐ Mental health hospitalizations in the past 5 years

**Please provide location, when and reason below**

MORTON, WILLIAM SCHELL (1901370377)                    COSB00674

# EXHIBIT 4

```
1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4
     WILLIAM SCHELL MORTON,          )
5                                    )
                                     )
6                                    )
                   Plaintiff,        )
7                                    )
                                     )
8                                    )
        vs.                          )   Case No.
9                                    )   5:21-cv-0052-JGB
                                     )   (SHKx)
10   COUNTY OF SAN BERNARDINO,       )
     et al.,                         )
11                 Defendants.       )
     _____ )
12

13

14

15              REMOTE DEPOSITION OF:

16                   REMUS DILIG

17              Friday, June 14, 2024

18                    Via Zoom

19

20   Reported By:

21   Nila Webber

22   CSR No. 4982

23   Job No. J11365864

24   Pages 1 - 65

25
```

```
 1              Friday, June 14, 2024, 2:07 p.m.

 2                          Via Zoom

 3

 4                          REMUS DILIG,

 5

 6         Was called as a witness by and on behalf of the

 7              Plaintiff, and after having been first

 8         duly sworn by the Certified Shorthand Reporter,

 9              was examined and testified as follows:

10

11                          EXAMINATION

12   BY MR. TERRELL:

13        Q    Can you please state and spell your first name

14   and last name for the record, please.

15        A    First name is Remus, R-e-m-u-s, last name is

16   Dilig, D-i-l-i-g.

17        Q    Okay.  Thank you very much.

18             And as you know, you're here today for your

19   deposition related to a lawsuit that was filed on

20   behalf of our client William Morton.  And myself and

21   attorney Sharon Brunner are suing the County of San

22   Bernardino and other jail personnel, contract

23   providers, and San Bernardino County deputies and other

24   medical staff.

25             Do you understand that?
```

 1   a registered nurse?

 2       A    I believe it was June 2016 when I passed my

 3   test.

 4       Q    2016.  Okay.  All right.

 5            And then after you became a licensed

 6   registered nurse in 2016, could you tell me where you

 7   were employed.

 8       A    I was employed at a hospice for six months.

 9       Q    All right.  And after the hospice, where did

10   you go?

11       A    I went to San Bernardino County Sheriff's

12   Department.

13       Q    And you've been there since that date?

14       A    Yes.

15       Q    Okay.  And now, when you first became

16   employed, what position -- were you in the same

17   position you were today, or where did you start off as

18   a registered nurse?

19       A    I started as a contract RN --

20       Q    Okay.

21       A    -- through like an agency, and then I became a

22   County employee somewhere in March 2017.

23       Q    Okay.  And what's your work date, what's the

24   first date that you became a member of the Sheriff's

25   Department?

1    would do the evaluation or assessment of suicide

2    individuals, correct?

3        A    Yes.

4        Q    Okay.  And I'm asking you those other people

5    that were primary job is to do that, what were their

6    titles?

7        A    They were clinical therapists or mental health

8    RN's.

9        Q    Clinical therapist.  What's their background

10   in, do you know?

11       A    No.

12       Q    Okay.  But they weren't RN's, correct?

13       A    No.  Different, yes.

14       Q    Okay.  All right.  And do you remember coming

15   into contact with William Morton?

16       A    I do not.

17       Q    I'm going to show you some medical records in

18   just a second, but just let me ask a few more questions

19   if we could.

20           When you made contact with Morton, that would

21   have been at the West Valley Detention Center, correct?

22       A    Correct.

23       Q    Okay.  And do you recall completing any chart

24   notes on that individual, Morton, when you saw him?

25           MR. ROBERTS:  You're asking if he recalls it

1    that's completed by you, is that correct, as a

2    supervisor?

3         A    Yes.

4         Q    Okay.  And the date on that would have been

5    January 13th of 2019.

6              And if I understand the time correctly, it

7    would have been about 7:06 in the morning.

8              Am I right about that?

9         A    Yes.

10        Q    And the patient is William Schell Morton at

11   the top.

12             Do you see that?

13        A    Yes, I see it.

14        Q    Okay.  On this first page that we're looking

15   at, the first line, it says Suicide Intake Risk

16   Assessment.

17             Is this something you compiled?  Did you check

18   that box, or blacken the circular box here?

19        A    I checked it.

20        Q    Okay.  And for suicide intake risk assessment,

21   can you tell me what exactly that entails.

22        A    So this is basically placing the patient into

23   a suicide watch queue.

24        Q    Okay.  When you say "suicide watch queue,"

25   what's the queue stand for?

1        A    It's just where all the patients go when
2    they're on suicide watch so we don't lose track of
3    them.
4             MR. ROBERTS:  Do you mean queue as in line
5    or -- like you queue up for a line at Disneyland?
6             THE WITNESS:  It's like a list.
7             MR. ROBERTS:  Not the letter Q, Counsel, like
8    queue as in like a list of patients that are on suicide
9    watch.
10            MR. TERRELL:  Thank you very much.
11            This is Exhibit 10.
12       Q    And so we're saying queue and my guess is
13   we're talking like the English do, for a line or list
14   of people then, is that what I'm getting?
15       A    Yes.
16       Q    Okay.  Very good.
17            Okay.  And then after that it has the patient
18   safety plan.
19            Is that something that you would fill out or
20   would you make a safety plan?
21       A    I would not, that would be mental health.
22       Q    Okay.  All right.  And the other one is, is
23   that -- it says check one.  And then down below in pink
24   it says:  Patient states I'm affirmative I'm homicidal
25   and denies S/I.

1       A     Suicidal ideations.

2       Q     Okay.  Are you saying that the patient

3  indicated he was very angry and wanted to hurt other

4  people, is that what we're saying here?

5       A     Yes.

6       Q     Okay.  Is that you are directly asking him how

7  he feels, does he feel like he's going to kill himself,

8  does he feel like he's going to injure someone else?

9       A     Yes, I always ask if they're either homicidal

10  or suicidal.

11      Q     When you ask them that, do you put down the

12  response verbatim or what do you do as far as

13  documenting what they say?

14      A     Yes, I put exactly what they said.

15      Q     Down below it, it says poor eye contact and he

16  was avoidant.

17            So you're saying when you met him on the 13th,

18  he wasn't trying to look you squarely in the eyes, he's

19  looking away.  Is that what that means?

20      A     Yes.  If someone doesn't make eye contact with

21  me, I put poor eye contact.

22      Q     Okay.  Now, this intake we're talking about,

23  were you trained to complete the suicidal intake, were

24  you trained on this document?

25      A     Yes.

1   impaired.

2         Is there a reason -- is the impaired just

3   that he's not thinking logically or not acting in a

4   certain way?

5     A    Yes.  If he's homicidal or suicidal, it's

6   impaired judgment.

7     Q    Okay.  And he is talking to you, because under

8   the speech, you put clear, correct?

9     A    Yes.

10    Q    Okay.  And once again, he's irritable, he's

11  angry it would appear from the mood, but you just

12  checked the one box irritable, right?

13    A    Yes.

14    Q    Okay.  Now, this is fascinating here because

15  we're going to hallucinations here and you've got a box

16  checked.

17        Could you tell me what that means.

18    A    Auditory.  So he's most likely hearing voices.

19    Q    Okay.  Now, have you been trained with

20  individuals hearing voices and stuff that those

21  particular individuals need to be taken to a mental

22  health facility or a hospital?  Have you ever been

23  trained to evaluate it like that?

24    A    No.

25    Q    Okay.  So when you're assessing someone and

1  psychologist for evaluation?

2      A    As medical, we do not make the appointment for

3  the referral to the psychologist.  Mental Health -- so

4  they're automatically placed on a queue and Mental

5  Health make the appointment for the psychologist.

6      Q    Okay.  So the individual's dangerous to

7  himself or others and there is not gonna be a referral

8  to a psychiatrist at all; is that correct?

9          MR. ROBERTS:  Objection, misstates testimony.

10          MS. SERA:  Join.

11          MR. ROBERTS:  You can answer if you understand

12  his question.

13          THE WITNESS:  Well, he's gonna see a

14  psychologist regardless, but I'm not allowed to make

15  that appointment as medical.

16  BY MR. TERRELL:

17      Q    Who has told you that you can't make that

18  appointment?

19      A    My trainer.

20      Q    Okay.  And the trainer is the same person you

21  mentioned before, McGee?

22      A    Yes.

23      Q    Okay.  But if you're evaluating someone to see

24  about whether they're suicidal or not, wouldn't it be

25  important for them to see a psychologist, because

1    they're also a danger to themselves, correct?

2        A    Correct.

3            MR. ROBERTS:  Objection, calls for speculation,

4    calls for -- lacks foundation, calls for speculation,

5    for expert opinion.

6            MS. SERA:  Join.

7    BY MR. TERRELL:

8        Q    Okay.  All right.  So during the mental health

9    assessment here for suicide, you are not required, nor

10   are you encouraged to contact any kind of a

11   psychologist or medical person; is that correct?  And

12   when I say medical person, I mean a medical doctor.

13           MR. ROBERTS:  Objection, misidentifies the

14   document.

15   BY MR. TERRELL:

16       Q    You can answer.

17           MR. ROBERTS:  You can answer.

18           THE WITNESS:  No, we are not to schedule

19   appointments for patients on suicide watch, that's

20   Mental Health duty.

21   BY MR. TERRELL:

22       Q    When do you get ahold -- is there a way for

23   you to expedite or get Mental Health involved in the

24   situation that you're in as far as evaluating someone

25   who's suicidal or harmful to others?

1    A    There is, but we have to place them onto the

2    queue first and they stay on suicide watch.

3    Q    All right.  Have you ever checked the box yes,

4    a referral?

5         You never have because you've been told never

6    to put in a referral, correct?

7    A    Correct.

8    Q    Okay.  Inmate agrees to contract for safety

9    and will notify -- this individual that's acting a

10   little irrational -- a lot irrational and angry, he

11   entered in a contract with you.

12        Could you explain that?

13   A    I never -- I can't ask him for that, that

14   would be Mental Health.

15   Q    Okay.  So you checked the box no because you

16   didn't go through that contract with him?

17   A    Yes, I can't do that as a medical.

18   Q    Okay.  And the next box there is recommended

19   transfer to -- could we hold on just for one second?

20        MR. ROBERTS:  Sure.

21        (There was an interruption in the

22   proceedings.)

23   BY MR. TERRELL:

24   Q    You indicated earlier that if you had not been

25   preparing this, the people that normally do it are

1    Mental Health people; is that correct?

2        A    That's correct.

3        Q    Okay.  And those people that I've understood

4    to be in that particular group would be the

5    psychologists, the medical doctors and this other

6    category of registered nurses and then some type of

7    clinicians, correct?

8        A    Correct.

9        Q    And had they had filled that out -- have you

10   seen them fill this document out?

11       A    I have not, no.

12       Q    Okay.  So you couldn't say whether they would

13   have filled this out differently than you did because

14   these boxes do apply to them?

15       A    I believe they would be more thorough in

16   filling it out for the mental health part.

17       Q    Okay.  And also they could have made a

18   referral; is that correct?

19           MR. ROBERTS:  Objection, calls for speculation,

20   lacks foundation.

21   BY MR. TERRELL:

22       Q    If you know.

23           MR. ROBERTS:  You can answer if you know.

24           THE WITNESS:  Yes, they're mental health

25   professionals.

1   UNITED STATES DISTRICT COURT              )

2   FOR THE CENTRAL DISTRICT OF CALIFORNIA    )

3

4       I, Nila Webber, CSR No. 4982, Certified

5   Shorthand Reporter, certify:

6       That the foregoing proceedings were taken before

7   me at the time and place therein set forth, at which

8   time the witness was put under oath by me;

9       That the testimony of the witness, the questions

10  propounded and all objections and statements made at

11  the time of the examination were recorded

12  stenographically by me and were thereafter transcribed;

13      That a review of the transcript by the deponent

14  was requested;

15      That the foregoing is a true and correct

16  transcript of my shorthand notes so taken.

17      I further certify that I am not a relative or

18  employee of any attorney of the parties, nor

19  financially interested in the action.

20      I declare under penalty of perjury under the

21  laws of California that the foregoing is true and

22  correct.

23      Dated this 20th day of June 2024.

24  Nila Webber   *Nila Webber*

25  CSR No. 4982

# EXHIBIT 5

1          UNITED STATE DISTRICT COURT FOR THE

2              CENTRAL DISTRICT OF CALIFORNIA

3

4    WILLIAM SCHELL MORTON,                    )
                                              )
5              PLAINTIFF,                      )
                                              )
6       V.                                    )CASE NUMBER 5:21-
                                              )CV-00052-JGB-SHK
7    COUNTY OF SAN BERNARDINO, DEPUTY          )
     KABLUYEN, DEPUTY PETERS, SERGEANT         )
8    JIM EVANS, AND DOES 1-10,                 )
     INCLUSIVE,                                )
9                                              )
               DEFENDANTS.                     )
10   _____      )

11

12

13

14

15   VIDEOCONFERENCE DEPOSITION OF PERSON MOST KNOWLEDGEABLE

16          FOR THE COUNTY OF SAN BERNARDINO

17               (KRISTIN FIGUEROA)

18

19               July 24, 2024

20                2:06 p.m.

21

22              Taken Remotely

23         Rancho Cucamonga, California

24

25      Christianne Lee Fong, CSR Number 7559, CCRR



1  representing Defendants Liberty Healthcare of California,

2  Inc.; Hafizullah, H-a-f-i-z-u-l-l-a-h, Azizi, A-z-i-z-i;

3  and Ely, E-l-y, Kirkendall, K-i-r-k-e-n-d-a-l-l.

4          MS. BRUNNER:  And Jim Terrell, representing

5  Plaintiff, no objection.  Jim?

6          MR. TERRELL:  Thank you.

7          MS. BRUNNER:  No objection?

8          MR. TERRELL:  No objection.

9

10              KRISTIN FIGUEROA,

11  having been first duly sworn testified as follows:

12                  EXAMINATION

13  BY MS. BRUNNER:

14     Q.   Good afternoon, Ms. Figueroa.

15          Ms. Figueroa, my name is Attorney Sharon

16  Brunner, and also in the room is attorney James Terrell,

17  and we represent the plaintiff in this action, William

18  Morton.

19          I introduced myself off camera or off the

20  record, but I wanted to let you know that we are

21  representing Mr. Morton in connection with an incident

22  and some incidents that occurred in the year 2019.

23          So most of my questions today will be related to

24  the issues that occurred or policies that were in place

25  in January of 2019 through February 7 of 2019.  I may ask



1          THE WITNESS:  A psychiatrist is in a QMHP

2     position.

3     BY MS. BRUNNER:

4          Q.    But there's other individuals as well; correct?

5          A.    Correct.  Any one of those QMHP individuals can

6     address urgent or emergent psychiatric needs.  They're

7     trained to do so, and that's how I interpret that policy.

8          Q.    Now, if I understand you correctly, anyone

9     during any point in an inmate's incarceration could

10    initiate this; is that correct?

11         MR. ROBERTS:  Vague and ambiguous as to what you

12    do you mean by "this," as in "initiate this"?

13         MS. BRUNNER:  Number 4.

14         MR. ROBERTS:  To make a referral?

15         MS. BRUNNER:  Correct.

16         THE WITNESS:  Yes.  To my understanding, it's

17    any staff can identify an emergency and refer an

18    emergency to the appropriate staff.

19    BY MS. BRUNNER:

20         Q.    Okay.  And let's talk a little about how

21    these -- let's go to Number 9 again.

22         How would these contacts by the psychiatrist or

23    the QMHP be documented?  Where would they be documented?

24         A.    In the electronic health record.

25         Q.    Is there ever a time that a contact would not be



1  know.

2      A.   (Witness reviews exhibit.)

3           Okay.

4      Q.   Okay.  So Number 9 would seem to indicate to

5  me -- and correct me if I'm wrong -- that there should be

6  a psychiatric visit to an inmate who is in a -- on

7  suicide watch or a safety cell placement at least daily.

8           Number 10 seems to indicate that QMHP will also

9  visit suicide watch patients daily.

10          Do you see that?

11     A.   Yes.

12     Q.   My question is, is that it appears from

13 Number 9, based on Number 10, that there should be a

14 psychiatric visit at least daily for a safety cell inmate

15 or a suicide watch inmate.

16          And is that incorrect?

17     MR. KIEFER:  Incomplete hypothetical,

18 mischaracterizes prior testimony.

19     MR. ROBERTS:  Vague and ambiguous, Counsel, as

20 to how you're using "psychiatric visit."  Do you mean by

21 a psychiatrist?

22     MS. BRUNNER:  I do.

23     MR. ROBERTS:  Maybe you can clarify that for us.

24     MS. BRUNNER:  Yes.

25          ///



1   BY MS. BRUNNER:

2       Q.   So, Ms. Figueroa, in Number 9 it appears that

3   there is -- it uses the word "psychiatric."

4            Is it your testimony that that does not require

5   a daily visit by a psychiatrist?

6       A.   To me, I would interpret it as a provider, and

7   our nurse practitioners would also qualify as a provider

8   under psychiatric care.

9            But I should also clarify the question asks

10  about any patient in clinical seclusion.  To later add on

11  to that Number 9, it says including if they're in suicide

12  watch/safety cell for mental health purposes.

13           So, if a suicide watch or safety cell are in

14  clinical seclusion, they get seen daily by psychiatric

15  personnel.  But, to clarify, to my knowledge, we did not

16  do complete clinical seclusion for any patient.  We had

17  them in safety cell, which I clarified earlier, which is

18  a type of suicide watch, and that is located within

19  intake, and that is a staff-assigned area.

20           So my interpretation is that it's not clinical

21  seclusion.

22      Q.   Understood.  So I guess my next question is

23  this:  In looking at Number 10, if Number 9 was intended

24  to be psychiatric staff, which includes QMHP, do you have

25  any explanation as the person most knowledgeable as to



1  why that "QMHP" was not used versus the word

2  "psychiatric"?

3     A.    On Number 9?

4     Q.    Yes.

5     A.    If it's implying -- to -- what it's implied here

6  to me is Number 9 is, yes, implying a provider on the

7  psychiatric.  And that's from -- what I interpret is

8  because clinical seclusion is more acute than the below,

9  standard suicide watch.

10    Q.    Right.  But you would agree in Number 9 that

11  clinical seclusion also includes, according to this

12  Number 9, suicide watch and safety cell placement?

13    A.    It can, but not always.

14    Q.    Right.  But your testimony -- correct me if I'm

15  wrong -- your testimony is in 2019 you're not aware of

16  any inmate that was in clinical seclusion?

17    A.    Not complete clinical seclusion, no.  They were

18  housed alone in a safety cell, but it's a staff-assigned

19  area with an intake.  So for my interpretation is they

20  were not in clinical seclusion, from what I understand in

21  psychiatric facilities or LPS that use "clinical

22  seclusion" as a definition.

23    Q.    Okay.  All right.

24          MR. ROBERTS:  Counsel, we've been going for

25  about an hour.  When you get to a convenient stopping



1      THE WITNESS:  I don't believe it's worded like

2  that anywhere on the policy.

3  BY MS. BRUNNER:

4      Q.   Okay.  Let's look further into the document.

5  Let's go to the next page.  I'm going to be asking you

6  questions under Item D, which is "Clinically Ordered

7  Placement in Safety Cells."  And we talked a little bit

8  about that on Policy 311.

9      All right.  Look at Item Number 5, please.

10     A.   (Witness reviews exhibit.)

11     Q.   Tell me when you're ready.

12     A.   Ready.

13     Q.   Okay.  In Item 5, it indicates that -- this is

14  my interpretation, so I'm asking for yours -- that (as

15  read):

16          A psychiatrist shall conduct a

17          face-to-face examination as soon as

18          possible, or at the beginning of the

19          next day shift if orders given after

20          hours, and every 24 hours thereafter

21          for a mental health evaluation and

22          document a treatment plan in the

23          patient's health record.

24          My understanding of this, reading this policy

25  word for word on Number 5, is that a psychiatrist, not a



1   QMHP, shall see an inmate who is in the safety cell every

2   24 hours.

3          Is your understanding different?

4      A.   (Witness reviews exhibit.)

5          Yes.  For me, it's while continuously in that

6   safety cell.  I mean, to me, it's, if they're released,

7   it doesn't pertain.

8      Q.   Right.  So my understanding is, if an inmate has

9   been placed in a safety cell and he remains in that

10   safety cell 72 hours, then there should be at least three

11   visits from a psychiatrist.

12          Would that be your understanding?

13          MR. KIEFER:  Vague and ambiguous.

14          THE WITNESS:  That's my general understanding of

15   Number 5.

16   BY MS. BRUNNER:

17      Q.   Okay.  All right.  So, keeping Number 5 in

18   consideration, let's go and return back to 311.2, page 2.

19          MR. ROBERTS:  That's Exhibit 31, Counsel?

20          MS. BRUNNER:  Yes.  Thank you so much.

21          MR. KIEFER:  Policy -- I'm sorry, let me go back

22   to it -- 311.2, page 2.  I have it, thank you.

23   BY MS. BRUNNER:

24      Q.   Then we're going to again return to Item 9.

25          So, Ms. Figueroa, after looking at Policy 319,



1    which was Exhibit 32, and looking at the safety cell

2    requirement that a psychiatrist see an inmate in a safety

3    cell every 24 hours, would you change your opinion

4    regarding Number 9 as it relates to a safety cell that it

5    could still be a QMHP?  Do you understand my question?

6         MR. KIEFER:  Mischaracterizes prior testimony

7    and the document.

8         THE WITNESS:  My understanding of "clinical

9    seclusion" still stands from previous definition that I

10   explained.  But, with the last policy that we reviewed,

11   safety cell, to my understanding, would require a

12   psychiatrist daily.

13   BY MS. BRUNNER:

14        Q.   Okay, thank you.  Let's now go to Exhibit

15   Number 33, if my number is correct, and that is going to

16   be Policy Number 110.

17        (Exhibit 33 marked.)

18   BY MS. BRUNNER:

19        Q.   Ms. Figueroa, do you recognize this policy?

20        A.   Yes, I've seen it before.

21        Q.   Okay.  And what is this policy's purpose, if you

22   know, if you can explain it to me?

23        A.   It's been a long time since I reviewed this

24   specific policy, so I'd have to see the whole thing to --

25        Q.   Sure.  And we can do that.  It's a two-page --

1    going to be COSB00109 through COSB00115.

2              (Exhibit 39 marked.)

3    BY MS. BRUNNER:

4       Q.   Ma'am, do you recognize this document as far as,

5    like, the format and what this would be pertaining to?

6              MR. ROBERTS:  If you need to see the other

7    pages, you can ask to see it.  Right now we just have

8    page 109 on the screen.

9              MS. BRUNNER:  Let's go through that.  That's a

10   good point, Dan.

11             THE WITNESS:  Appears to be medication

12   administration record.

13   BY MS. BRUNNER:

14      Q.   So, in looking at what's been pulled up right

15   now -- what's the mark on that?

16             MR. TERRELL:  00115.

17   BY MS. BRUNNER:

18      Q.   So, looking at COSB00115, you see to the right

19   there's the words in different columns, "Refused,"

20   "Refused," "Refused," "Refused," and then there's

21   "Administered," "Administered," "Administered,"

22   "Refused," and "Refused?"

23             Would this be the log or the electronic portion

24   of the medical record that would show when medication is

25   refused by the inmate?



CERTIFICATE OF REPORTER

I, Christianne Lee Fong, CSR 7559, CCRR, a
certified shorthand reporter in and for the county of Los
Angeles, State of California, do hereby certify;

That KRISTIN FIGUEROA, the witness named in the
foregoing deposition, was, before the commencement of the
deposition, duly administered an oath in accordance with
CCP 2094;

That said deposition was taken down in
stenograph writing by me and thereafter transcribed into
typewriting under my direction.

I further certify that I am neither counsel for
nor related to any party to said action, nor in anywise
interested in the outcome thereof.


Dated July 27, 2024.



CERTIFIED SHORTHAND REPORTER
IN AND FOR THE COUNTY OF
LOS ANGELES
STATE OF CALIFORNIA

# EXHIBIT 6

1                 UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3

4        _____

WILLIAM SCHELL MORTON,                    )
5                                         )
                          Plaintiff,      )
6                                         )
              vs.                         )Case No.
7                                         )5:21-cv-0052-JGB (SHKx)
COUNTY OF SAN BERNARDINO, et              )
8        al.,                             )
                                          )
9                         Defendants.     )
         _____)
10

11

12                 REMOTE DEPOSITION OF

13                   EMILY NEWTON, RN

14                FRIDAY, JUNE 14, 2024

15

16

17

18

19

20

21

22

23

24
         Reported by Ann Morales, CSR No. 12378
25       Job No. J11365856



800.211.DEPO (3376)
EsquireSolutions.com

1    from January 11th to February 7th, 2019, are the primary

2    times I'm talking about -- from January to February of

3    2019, throughout that period, from 2013 to there, what

4    areas of the jail had you worked?

5        A.    I'm sorry.  Can you -- can you restate that.

6        Q.    I sure can.

7              Since you've been employed by the county, have

8    you worked only at the West Valley Detention Center?

9        A.    No.

10       Q.    Okay.  Where else have you been stationed?

11       A.    I've worked at all four of the big jails,

12   which would be West Valley Detention Center, High Desert

13   Detention Center, Central Detention Center, and

14   Glen Helen Rehabilitation Center.

15       Q.    Okay.  All right.

16             And now from the time you were hired in

17   November of 2013 to 2019, as of February 7th of 2019,

18   what facilities had you been to?  Had you been to all

19   four of those by that time, 2019?

20       A.    Yes.

21       Q.    Okay.  Just at West Valley Detention Center,

22   do you work in a specific area when you're on assignment

23   in a jail?  Are there different areas, units, for

24   example, that you would be working in?

25             MR. ROBERTS:  Objection.  Vague and ambiguous



1    selected anything in those fields.

2        Q.    Okay.  All right.  We'll go to the next one.

3    And on this one here, it indicates the affect.  There's

4    nothing checked by you on that one.  And "Speech," it's

5    "volume appropriate" this time of "yes."

6           Do you recall if you put that in that box or

7    that you checked it?

8        A.    It does not appear to me that I selected any

9    of those responses.

10       Q.    Okay.  How about the one at "10:30, PT OTH"?

11       A.    So that would have been documented by me,

12   indicating that at 10:30, when this log was completed,

13   the PT, or patient, was OTH, which is an abbreviation

14   for "out to hospital."

15       Q.    Okay.  All right.  Now, this particular

16   client, do you recall -- we're going to go back.  That's

17   the next page, and then that's it for Exhibit 3.

18          Did you refer an ER referral, completed by you

19   on 2/3/2019?  Do you remember that?

20       A.    I do not recall.

21       Q.    Did you see that in your review of notes today

22   about an ER referral -- referral, excuse me -- a

23   referral made by you on 2/3/2019 at 1:32?

24       A.    Yeah, I do remember there was an ER referral

25   that I had written.



1        Q.    Okay.  And in that ER referral, it has

2   details.  It says:  "Patient observed in S/W cell to be

3   running into pony wall and doing cartwheels head first

4   into toilet times three."

5             Do you recall making that entry?

6        A.    I do not recall making that entry.  It would

7   be helpful to see the form.

8        Q.    Okay.  Give me one second.  I think we can

9   find that form and put it up for you.

10            MR. TERRELL:  I think it might be a good place

11   to take a break.  Could we take a ten-minute break, and

12   I can get that?

13            MR. ROBERTS:  Yeah, that would be fine.  So

14   come back at about 11:10?

15            MR. TERRELL:  That's perfect, yeah.  That's

16   great.

17                         (Recess.)

18   BY MR. TERRELL:

19        Q.    All right.  So we have put up the document

20   that I was referring to, and if you could tell me if

21   you're familiar with this document.

22        A.    Yes, I am familiar with this document.

23        Q.    All right.  And at the top it says

24   "ER Referral" by you, "Emily Newton, RN, on 2/3/2019";

25   is that correct?



1          You can answer, if you recall.

2          THE WITNESS:  I don't recall, no.

3   BY MR. TERRELL:

4     Q.   Okay.  Well, normally if you take a report

5   from somebody that's saying the individual is trying to

6   kill themselves, wouldn't you take that person's name

7   down?

8          MR. KIEFER:  Objection.  Assumes facts not in

9   evidence that this act was an attempt to kill himself.

10         MR. TERRELL:  Okay.

11         MR. ROBERTS:  You can answer the question, if

12  you know.

13         THE WITNESS:  Can you re-ask the question?

14  I'm sorry.

15  BY MR. TERRELL:

16    Q.   Yeah.  If someone -- if another employee,

17  whether it be a nurse or a deputy, had reported that

18  this individual was doing cartwheels and trying to kill

19  himself, wouldn't you take that person's name down?

20    A.   No.

21    Q.   Okay.  And right above it, in the boxes that

22  you checked, you checked "suicide attempt"; correct?

23    A.   I did.

24    Q.   Okay.  And you're the one that put the

25  checkmark for suicide attempt; right?



1    Q.    Yeah.  You don't have to necessarily see the

2    individual attempt to kill himself.  If it's reported to

3    you, you can check the box that says "suicide attempt."

4    A.    Correct.

5    Q.    Okay.  So after that line of "X3" -- and you

6    believe that to mean this individual did that three

7    times; correct?

8    A.    Yeah, that it was reported that he had done it

9    three times.

10    Q.    Okay.  You've never been told or taught not to

11    put down deputies' names, have you?

12    A.    No.

13    Q.    All right.  And then next to the period after

14    the "X3," you write:  "No LOC observed."

15          What does that mean?

16    A.    "LOC" is an abbreviation for "loss of

17    consciousness."

18    Q.    Okay.  And that would be -- is that you didn't

19    observe him or anyone else didn't observe him lose

20    consciousness; correct?

21    A.    Yes.

22    Q.    How about next to it, a -- "Patient with plus

23    psych HX"?  Can you tell me what that means?

24    A.    "Patient with positive psychiatric" -- "HX" is

25    an abbreviation for "history."



1          Q.    Okay.  So at this time you've looked at his

2    history, you know of his history to write that down?

3          A.    It would appear so.

4          Q.    You don't remember?

5          A.    I don't remember, no.

6          Q.    The comments stated here, "I need to go to the

7    mental hospital," that's being attributed to the patient

8    or Mr. Morton; correct?

9          A.    Correct.

10         Q.    And for you to put down what you just said

11   about knowing the psych history -- psych history, excuse

12   me -- you would have had to -- you would have had to

13   receive that when?  How did you know that information to

14   write that down on this entry?

15         A.    From his chart.

16         Q.    From his chart.

17               Is that a chart that's different from the ones

18   that we've seen?  That's not a chart that we're looking

19   at on the earlier exhibits, including this one?

20         A.    I'm sorry.  Can you --

21         Q.    Yeah, just -- yeah, just where did you get the

22   history?  You say "psych history."

23               Where are you now picking up his psych history

24   from?

25         A.    Yeah, from his chart.



1    that being attributed to Mr. Morton?

2         A.   It appears to me that I documented that the

3    patient was stating, "I need to go to the mental

4    hospital."

5         Q.   Okay.  And then you write down that patient

6    was seen -- or sent, excuse me -- to ER on 1/30/19.

7              Now, for you to get that information, you'd

8    have to be reading the history; correct?

9         A.   I would have had to have looked at a previous

10   ER discharge, correct.

11        Q.   Okay.  And can you help me out with the next

12   words behind it, "With DX:  Facial LAC times 2"?

13        A.   Yes.  "With a diagnosis from the ER of a

14   facial laceration times two."  So he had two facial

15   lacerations the previous time he was sent to the ER.

16        Q.   Okay.  So is that in reference to the -- to

17   the entry of 1/30/19?  Those are the entries that you're

18   reading about the soft collar.

19             Are those from that date?

20        A.   Yes.

21        Q.   Okay.

22        A.   And also just for the record, "CHI" is an

23   abbreviation for "closed head injury."  So he -- that

24   was also part of his diagnosis.

25        Q.   Okay.  And so that's all in reference to what



1    And then you've indicated, later on, is

2 that -- in this one, that you've evaluated and looked at

3 his eyes and his brow, some injuries there, and his toe

4 and other lacerations?

5    Who did you pass that information on to?

6    A.   This document is intended to be given to the

7 staff at the ER so that they are aware of the patient

8 and why we're sending them there to be evaluated.

9    Q.   Okay.  And did you make any notifications to

10 any of the individuals that work in the psych ward or

11 any of the doctors there, that there had been a suicide

12 attempt?

13    A.   This note was just to the ER.  So it wouldn't

14 reflect if any notification was made to mental health.

15    Q.   Okay.  I'm just wondering if your policy and

16 procedure that you were trained on did not indicate to

17 you that when an individual tries to terminate his or

18 her own life that there is individuals that you must

19 give notice to.

20    MR. ROBERTS:  I'm going to object to the

21 extent that it calls for speculation, and witness lacks

22 foundation, if you're asking her for what the county's

23 policy is.

24    If you're asking her for what her recollection

25 and her understanding was, she can answer that question.



1          MR. TERRELL:  And I'll be asking as to her

2    recollection and what she did, yes.

3          THE WITNESS:  The patient was housed on

4    suicide watch, and I -- it doesn't appear that at this

5    time -- and I don't remember making a -- any referral at

6    this time.  I was sending him to the emergency room at

7    this time.

8    BY MR. TERRELL:

9      Q.   And when did you make a referral?  How is that

10   done?

11         MR. ROBERTS:  It's vague and ambiguous.

12   Referral to -- referral to --

13         MR. TERRELL:  Okay.  I'll -- withdrawn.

14   BY MR. TERRELL:

15     Q.   When you say "referral," is there another

16   referral you can do within the West Valley Detention

17   Center?  You can make a referral to a psychiatrist or

18   give some kind of knowledge as to mental health?

19     A.   I am able to make a referral to mental health,

20   yes.

21     Q.   Okay.  And did you do it in this case?

22     A.   The patient was on suicide watch, so he was --

23   as far as I understand, they are already followed by

24   mental health daily.

25     Q.   Okay.  So the short answer is "no," correct?



1  You didn't give notification to a site or any other

2  individuals.

3      A.   I don't recall making a referral based off of

4  this documentation.  I don't -- I don't remember.

5      Q.   Okay.  Now, if we can go to the next page, and

6  I think this is -- when it says "Referring Provider,"

7  could you tell me what that name is?  Is that an

8  employee of the West Valley Detention Center?  Do you

9  know who that individual is?

10     A.   That would be the referring provider from

11 West Valley Detention Center.

12     Q.   Okay.  All right.

13          Now, when you looked up his history, were you

14 able to see if Mr. Morton was seen daily by a

15 psychiatrist on the date of 2/3?

16     A.   I don't recall reviewing his chart on that

17 day, so --

18     Q.   Okay.  All right.

19          Generally is not -- when someone is in suicide

20 watch, do they not see a psychiatrist every day that

21 they are in the suicide watch?

22     A.   From my understanding, yes, they do.  And then

23 when --

24     Q.   Okay.

25     A.   Let me clarify.



1              REPORTER'S CERTIFICATION

2

3        I, Ann Morales, a Certified Shorthand Reporter in

4    and for the State of California, do hereby certify:

5        That the foregoing witness was by me duly sworn;

6    that the deposition was then taken before me at the time

7    and place herein set forth; that the testimony and

8    proceedings were reported stenographically by me and

9    later transcribed into typewriting under my direction;

10    that the foregoing is a true record of the testimony and

11    proceedings taken at that time; that reading and signing

12    of this transcript by the witness was not discussed.

13

14        IN WITNESS WHEREOF, I have subscribed my name this

15    1st day of July, 2024.

16

17

18

19              Ann Morales, CSR No. 12378

20

21

22

23

24

25



# EXHIBIT 7

CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

Case No. 5:21-cv-00052-JGB (SHKx)

--------------------------------------------------------------

WILLIAM SCHELL MORTON

    Plaintiff,

vs.

COUNTY OF SAN BERNARDINO; DEPUTY
KABLUYEN; DEPUTY PETERS; SERGEANT
JIM EVANS; AND DOES 1-10, INCLUSIVE

    Defendants.

--------------------------------------------------------------

DEPOSITION OF OF DR. JEFFREY L. METZNER

September 5, 2024

Chelsea Winborne, CVR, Notary Public
1194914





(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine    (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose    (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento    (800) 222-1231 Martinez    (702) 366-0500 Las Vegas    (800) 222-1231 Monterey
(951) 686-0606 Riverside    (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson    (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn    (518) 490-1910 Albany    (914) 510-9110 White Plains
(312) 379-5566 Chicago    00+1+800 222 1231 Paris    00+1+800 222 1231 Dubai    001+1+800 222 1231 Hong Kong

1    Remus Dilig, Emily Newton, Kayla Peters, and Jarred

2    Kabluyen.

3             THE VIDEOGRAPHER:  Will the court reporter

4    please swear in the witness.

5                      JEFFREY L. METZNER, M.D.

6    having been first duly sworn/affirmed, was examined and

7    testified as follows:

8                         EXAMINATION

9    BY MR. KIEFER:

10        Q.    Good morning, Dr. Metzner.

11        A.    Good morning.

12        Q.    This obviously is a deposition in the case of

13    William Morton, and you've had your deposition as -- taken

14    as an expert before, correct?

15        A.    Correct.

16        Q.    I'm going to try to keep my voice up because it

17    was a little loud -- I'm sorry, low, because I am being

18    picked up by your microphone.  We have a setup here where

19    some attorneys are distant, and we've set up for a Zoom

20    link, and I'll be sharing documents.  But we also probably

21    have documents on paper you and I can look at.  But we

22    have both in-person and remote going on.

23        That stated, are you familiar with the admonitions

24    for deposition that are customarily given with regard to

25    wait until I finish speaking, don't speculate, tell the

7

```
 1   mental health professional, not specific to a
 2   psychiatry -- psychiatrist -- and I think any plain
 3   reading of the policies and procedures makes that very
 4   clear that's inaccurate.
 5       Q.    All right.  We'll get to those in a minute.
 6            MR. KIEFER:  I just want to verify, I am not at
 7   this moment sharing my screen, am I?
 8            THE DEPONENT:  No.
 9            MR. ROBERTS:  You're good.
10       Q.    (By Mr. Kiefer) Thank you.  I'm going to go back
11   to the expert report, which I believe was 61.
12       A.    And I also -- back to your question, the other
13   issue that I think you're alluding to is both she and Dr.
14   Azizi said that seclusion -- that Mr. Morton was never
15   secluded, and they said that because the cell he was in
16   was not secluded.  And I, in my report made it very clear
17   that that is not the definition of clinical seclusion, and
18   it's not just my opinion.  You just have to read their
19   policies and procedures, which makes that very clear.
20       Q.    We'll get into them in a minute, but at page 18
21   of Exhibit 61, I have highlighted a paragraph "In
22   contrast, Dr. Azizi and Nurse Figueroa" where you conclude
23   is clearly not consistent with policy 319, see section D.
24       Are you stating here that, by any stretch of the
25   imagination, are you saying that either Nurse Figueroa or
```

47

1    Dr. Azizi, you believe, has engaged in the purposeful

2    misconstruction of the county policies and procedures in

3    order to avoid a conclusion that for an inmate in a safety

4    cell or a suicide watch cell that at least daily, there

5    would be a visit by a psychiatrist?

6            MR. TERRELL:   I'm going to object to that

7    question as compound and argumentative.   Go ahead.

8        A.    I'm not attributing motive to why they said what

9    they said.   I'm just saying that they were wrong, and just

10   like I previously testified, someone under sworn testimony

11   can believe what they're saying is accurate.   That doesn't

12   mean that it's accurate, and I think this is a very good

13   example.

14       Q.    (By Mr. Kiefer) And inaccuracy in this situation

15   is based upon your reading of the policies themselves?

16       A.    It's based on two things.   First of all, it's

17   based on my clinical experience among -- I've evaluated

18   jails and prisons in over 40 states, and doing those

19   evaluations, it involves looking at policies and

20   procedures.   So one, it involves my clinical experience in

21   policies and procedures around the country in corrections;

22   it also involves my clinical experience in working in

23   hospitals and mental health settings in Colorado; and it's

24   confirmed by reading of their own policies and procedures.

25       Q.    Okay.   Setting aside San Bernardino County's

48

DR. JEFFREY L. METZNER

1          Q.    What's in there of note?  I see some yellow

2    highlighting, if you could just tell me.

3          A.    Yes.  What's highlight -- oh, thank you for

4    reminding me.  One of the things on Number 8, suicide

5    concern.  It's yes.  It's checked off.  Victor Valley

6    Hospital stated, seen 12/31/18, release transfer form to

7    Canyon Ridge Hospital.  He was released 1/4/19 from Canyon

8    Ridge with a new prescription.  So this is a critical form

9    because one of my criticisms of the whole process was that

10   it looks like the arresting officers didn't convey on the

11   receiving screening this history, which was known to them.

12   And it also appeared that this information, which I

13   believed was obtained from his mother on the 11th, either

14   was not conveyed to mental health staff or ignored by

15   mental health staff, and the -- one of -- well, I can tell

16   you more but I'll let you ask me questions.

17         Q.    Okay.  So -- so I think we're in agreement that

18   the -- there was one self-harming in custody event

19   striking the head against the glass of the sobering cell

20   by the time Ely Kirkendall saw him, and then the remainder

21   happened afterwards.  She never saw him after?

22         A.    Correct.

23         Q.    And Dr. Hafizullah Azizi, what was in his

24   history was the sobering cell incident, self-harming

25   incident of the 11th, and the incident of the 27th for

100

1    that something else, is it both?

2         A.   It's both.  I -- when I was talking about

3    policy, I talked about the suicide prevention policy which

4    requires it, but it's also required by the standard of

5    care.

6         Q.   Okay.  And your understanding of the standard of

7    care is generally drawn from your years of experience

8    doing this?

9         A.   Yes.

10        Q.   Is it accurate that Mr. Morton never received a

11   suicide risk assessment by a mental health clinician?

12        A.   I think it's accurate to say he never received

13   an adequate suicide risk assessment.  There were partial

14   assessments done, but he never -- and he, at the very

15   least, I would define adequate, at least, in terms of

16   following their own policy and procedure.

17        Q.   And do I understand correctly that when you say

18   they didn't follow their own policy and procedure as far

19   as doing the suicide risk assessment, it was filling out

20   that section of the form that you looked at with

21   Mr. Keifer?

22        A.   Yes.

23        Q.   Page 16 of your report, the very top, you write

24   "The treatment provided to Mr. Morton was characterized by

25   lack of continuity of care.  Specifically, it does not


                                181

1    appear that a mental health clinician was identified as

2    his primary -- apparent lack of development of a

3    therapeutic alliance with a mental health clinician."

4        A.    So you're breaking up.

5        Q.    Which brings --

6        A.    You're breaking up.  For the court reporter, let

7    me read what you're reading, so you can get the record.

8        Q.    Please.  Thank you.

9        A.    In my page 16 of my report, I put the following:

10    "The treatment provided to Mr. Morton was

11    characterized by lack of continuity of care.

12    Specifically, it does not appear that a mental health

13    clinician was identified as his primary mental health

14    clinician, which contributed to the apparent lack of

15    development of a therapeutic alliance with a mental health

16    clinician."

17        Q.    Thank you, Doctor.  I appreciate that.  And

18    please do let me know if we have a Zoom glitch again.

19        The phrase, continuity of care, do I understand

20    correctly that that means having an identified primary

21    mental health clinician that this is your primary doctor

22    or clinician, Mr. Morton?

23        A.    In this context, yes.

24        Q.    Okay.  What standard requires that a jailed

25    inmate have a prim -- an identified primary mental health

DR. JEFFREY L. METZNER

1    clinician?

2         A.   I don't think it's below the standard of care

3    not to have a primary mental health clinician.  But by not

4    having one, the -- all the various other systemic issues

5    I've described get exacerbated because by having one,

6    that's a guardrail against bad things happening because

7    policies and procedures aren't followed.  So I'm not

8    saying that by not having it is below the standard of

9    care, but I am saying by not having it, it exacerbated the

10   treatment problems that, in my opinion, ultimately

11   resulted him in harming himself significantly.

12        Q.   Now, you refer multiple times in your report to

13   Mr. Morton's refusal to take his medication and that it

14   does not appear that a psychiatrist or mental health staff

15   were notified.

16        Would you agree with that statement that you made

17   that clear?

18        A.   Yes, I agree with that.

19        Q.   Okay.  Is it your understanding that

20   psychiatrist or mental health staff were supposed to be

21   notified each time that Mr. Morton refused his medication?

22        A.   Well, I wouldn't say that they were required to

23   be notified each time.  I think it's contextual, but I

24   think that he had a pattern of medication refusals and his

25   clinical condition was getting worse.  He should have been

183

DR. JEFFREY L. METZNER

1    the jail records.  I certainly want the policy and

2    procedures for mental health.  I certainly want the police

3    reports, and I want you to send me relevant depositions.

4    And I think the only time that then -- so that was done at

5    the beginning, and I think the only time then that I asked

6    for additional information was when I saw that

7    Mr. Morton's deposition had been taken.

8        Q.   I am very close to the end here, so I want to

9    let you -- just so I post for you kind of where we're at.

10       At page 18 of your report, you again reference this

11   issue about clinical seclusion and Nurse Figueroa's

12   testimony about psychiatric, and you've already given a

13   lot of answers about that.  I won't belabor the point, but

14   I do have a couple of specific questions.

15       Is it accurate to say that you interpret the county's

16   policy on the meaning of clinical seclusion and

17   psychiatric in those points 9 and 10 that we looked at a

18   few hours ago now differently from how Dr. Azizi and

19   Ms. Figueroa interpret them as testified to in their

20   deposition?

21       A.   I think that's very accurate, and I'd recommend

22   you talk to any mental health clinician and see if they

23   give you a clinical seclusion definition that either one

24   of -- either Dr. Azizi or Nurse Figueroa gave.  That's

25   just -- that's just not accurate.


                              194


                    DR. JEFFREY L. METZNER

1      Q.    Is it your understanding that any placement in a

2   suicide watch cell is clinical seclusion?

3      A.    By their policy and procedure, the only

4   exception would be -- I was going to say yes -- I would

5   say yes, unless when they put someone on suicide watch,

6   they let them out of their cell.  If they let them out of

7   their cell, then it's not seclusion.  But if it's a locked

8   cell and the only time they lock -- let them out is for

9   bathroom -- for a bathroom break or to come out for

10  medication, that's seclusion.

11     Q.    In that same regard that was in discussion

12  earlier in your deposition about the requirement under, I

13  think it's point 9 that said a psychiatrist visit and

14  point 10 was the QMHP visit and whether or not those were

15  duplicative and all that, is it your understanding that a

16  psychiatrist is a QMHP?

17     A.    Yes.  But it's also my understanding that when

18  you have, with that 9 and 10, if they had been seen by a

19  psychiatrist only, that would have satisfied the policy

20  because it was -- it was -- if they wanted to say a QMHP

21  only, then a psychiatrist could have seen him and would

22  have counted, but when they specify a psychiatrist and a

23  QMHP, they know that a psychiatrist is a QMHP, so they

24  wouldn't make that separate if that's not what they

25  intended to do.

195

DR. JEFFREY L. METZNER

1      Q.    And in this particular case, did Mr. Morton need

2   constant observation?

3            MR. ROBERTS:   Objection, asked and answered.

4   Exceeds the scope of the report.

5      A.    That's hard to answer without having a adequate

6   suicide risk assessment being done, so I don't know is the

7   answer.

8      Q.    (By Mr. Terrell)  Okay.  Now, you've offered

9   several opinions today.  Some opinions, you've conceded,

10  are more serious than others.

11           Would you agree with that?

12     A.    Yes.

13     Q.    Okay.  Some of the opinions you have given such

14  as a non-staggered cell check every 15 minutes may have or

15  may not have led to self-enucleation.

16          Would you agree with that?

17     A.    Yes.  What I said, that I didn't think that that

18  had led to self enucleation.

19     Q.    Okay.  But what failures do you believe led to

20  the self-enucleation?

21     A.    Okay.  So I would just rephrase the question a

22  little bit, and my question would be:  What actions do I

23  believe lead to him seriously harming himself, in this

24  case, self-enucleation.  I think the lack of adequa --

25  untimely and inadequate psychiatric follow-up and

198

DR. JEFFREY L. METZNER

1   assessments, and lack of adequate suicide risk assessments

2   put him at significant risk of harming -- seriously

3   harming himself.

4        Q.   Okay.  And is it your opinion that Mr. Morton

5   received adequate or appropriate mental health care at the

6   West Valley Detention Center?

7             MR. ROBERTS:  Objection.  Compound, vague and

8   ambiguous.  Extends and exceeds report while it's

9   (inadilble.)

10       A.   It's my opinion that he did not.

11       Q.   (By Mr. Terrell) Okay.  And we talked about

12  continuity of care.

13       To summarize, what opinions did you form about the

14  continuity of care or lack of continuity of care at West

15  Valley Detention Center?

16       A.   Well, the lack of continuity of care, one, I

17  think contributed to him never getting an adequate suicide

18  risk assessment; number two contributed to him not forming

19  what -- the jargon is therapeutic alliance that -- which

20  would have helped address his uncooperativeness and his

21  treatment refusals, and would have -- and also contributed

22  to lack of an adequate treatment plan because I don't

23  think anyone felt responsibility as this is my patient.  I

24  think what they felt, this is my patient today at this

25  hour and I'll do the task and I'm done.

199

DR. JEFFREY L. METZNER

1      Q.   All right.  And do you believe that these -- a

2  lack of continuity of care failures led to Mr. Morton's

3  self-enucleation?

4      A.   I think that was one of many contributing

5  factors leading to his seriously harming himself.

6      Q.   Okay, that's all I have.

7      A.   I just have one question.

8      The -- I'm blocking your colleague's name.  Other

9  attorney who questioned me --

10          MR. TERRELL:  Mr. Keifer.

11      A.   Mr. Keifer.  He -- I will -- I guess, you tell

12  me.  I can send him a bill for what's not covered by the

13  check that I'm supposed to get today, and the two of you

14  can decide how you split that up or if you split that up.

15      Does that work okay from your perspective?

16          MR. ROBERTS:  That works fine from my

17  perspective, yes.

18          THE DEPONENT:  Okay.  Thank you.

19          MR. TERRELL:  Thank you.

20          MR. ROBERTS:  I have -- I have no further

21  questions of you, Dr. Metzner.  I appreciate your time

22  very much.

23          Counsel, do you wish invoke the option under

24  rules to review and sign?

25          MR. TERRELL:  Yes.


                              200

                    DR. JEFFREY L. METZNER

REPORTER'S CERTIFICATE

1

2          I, Chelsea B. Winborne, Certified Verbatim

3   Reporter and Notary Public within and for the State of

4   Colorado, commissioned to administer oaths, do hereby

5   certify that previous to the commencement of the

6   examination, the deponent was duly sworn/affirmed by me to

7   testify the truth in relation to matters in controversy

8   between said parties.

9          I further certify that this deposition was

10  taken through the use of the voice-writing method by me at

11  the time and place herein set forth and thereafter reduced

12  to a typewritten form; that the foregoing constitutes a

13  true and correct transcript to the best of my ability.

14         I further certify that I am not related to,

15  employed by, nor of counsel for any of the parties or

16  attorneys herein, nor otherwise interested in the result

17  of the within action.

18

19

20          *Chelsea B. Winborne*

21          Chelsea B. Winborne
            Certified Verbatim Reporter
22          Magna Legal Services

23

24

25

203

DR. JEFFREY L. METZNER

# EXHIBIT 8

1          UNITED STATES DISTRICT COURT FOR THE

2              CENTRAL DISTRICT OF CALIFORNIA

3

4  WILLIAM SCHELL MORTON,        )
                                 )
5              Plaintiff,        )
                                 )
6  vs.                           )    Case No.:
                                 )    5:21-cv-00052-
7  COUNTY OF SAN BERNARDINO,     )    JGB-SHK
   DEPUTY KABLUYEN, DEPUTY       )
8  PETERS, SERGEANT JIM EVANS    )
   AND DOES 1-10, INCLUSIVE,     )
9                                )
               Defendants.       )
10 _____)

11

12

13       REMOTE DEPOSITION OF DR. HAFIZULLAH AZIZI

14                  AUGUST 7TH, 2024

15             RANCHO CUCAMONGA, CALIFORNIA

16

17

18

19

20

21

22

23

24  JOB NO.:       J11589992
    REPORTED BY:   MARIE WILSON
25                 CSR NO. 13480



1            RANCHO CUCAMONGA, CALIFORNIA;

2        WEDNESDAY, AUGUST 7TH, 2024, 9:03 A.M.

3

4                DR. HAFIZULLAH AZIZI,

5     having first been duly sworn, testified as follows:

6                      ---oOo---

7                     EXAMINATION

8  BY MS. BRUNNER:

9        Q.   Good morning, doctor.  My name is Sharon

10 Brunner, and I'm with my partner Jim Terrell, who is

11 also present in the room.  We'll be taking your

12 deposition today.

13       A.   Good morning.

14       Q.   Can you hear me okay?

15       A.   Yes, I can.

16       Q.   Okay.  Now, along with my partner Jim Terrell,

17 we represent William Morton in a lawsuit against the

18 County of San Bernardino and some deputies, yourself and

19 some medical individuals concerning an incident that

20 ultimately occurred on February 7th, 2019.

21            Are you familiar with that date?

22       A.   I reviewed the chart that was my own notes, so

23 am familiar with my own notes and can answer based on

24 that.

25       Q.   Most of my questions are going to be centered



1  Center.

2           I was not the chief psychiatrist, I was not

3  the chief mental health officer and I was not definitely

4  the on-call person as well, so there is no reason that I

5  get notified about everything.

6           MS. BRUNNER:  Sure, Dr. Azizi.

7       Q.   And when I say the word "notify" or

8  "notification," I mean in any way, written, chart

9  documentation, telephonically or otherwise, and I

10  understand your clarification, but do you have any

11  independent recollection of being notified of this

12  incident?

13           MR. KIEFER:  May call for -- as I said, it may

14  call for speculation.  It's a long chart, and the

15  documents may refresh his recollection.  It's not a

16  memory quiz.

17           MS. BRUNNER:  Absolutely.

18       Q.   Dr. Azizi.

19       A.   I don't recall.

20       Q.   All right.  Dr. Azizi, would you agree that

21  there are inmates in 2019 that may have not been

22  suitable based on their mental health to be housed at

23  West Valley?

24           MR. ROBERTS:  Objection, incomplete

25  hypothetical, calls for speculation.



1          THE WITNESS:  Again, I'm not in a position to

2    answer this question.

3    BY MS. BRUNNER:

4       Q.   Well, was there ever a time in 2019 and

5    forward that you have indicated in the record or chosen

6    to have an inmate transferred out of the facility

7    because the services that that inmate required were not

8    present at West Valley Detention Center?

9          MR. ROBERTS:  Objection, vague and ambiguous,

10   calls for speculation.

11         THE WITNESS:  In general, if the patient is

12   not supposed to be in the hospital -- I mean the jail,

13   they send them to the hospital, that's a high level of

14   care if that's what your question is.

15         MS. BRUNNER:  Sure.

16      Q.   Have you ever had a patient transferred from

17   West Valley Detention Center, for example, to Patent

18   State Hospital?

19      A.   I -- I don't recall specific, but it will

20   happen.

21      Q.   Okay.  Let's go back to what's been marked

22   already as Exhibit No. 42, and, again, it's COSB002171,

23   and the page I'm going to be looking at specifically is

24   COSB002175.

25         And give us a moment, and we'll give you the



 1  first page, too, so you can see what the title of the
 2  policy is again.
 3          So this is the policy, Dr. Azizi, that has
 4  subject "Mental Health Screening Assessment and
 5  Evaluation," and it's quite -- let's go to page 002175
 6  and look at item M.  Take a look at item M, Dr. Azizi,
 7  and let me know when you're done.
 8      A.   Okay.
 9      Q.   So my understanding of this policy in item M
10  is that there are patients who require acute mental
11  health services beyond those available at West Valley
12  Detention Center, then they shall be transferred to an
13  appropriate provider as determined by the psychiatrist.
14          Is that your understanding?
15      A.   That's what it says there.
16      Q.   And at West Valley Detention Center in 2019,
17  was there the ability to have constant supervision of an
18  inmate at that time?
19          MR. ROBERTS:  Objection, vague and ambiguous.
20          MR. KIEFER:  I'll join, incomplete
21  hypothetical.
22          MR. ROBERTS:  Lacks foundation.
23          THE WITNESS:  What does that constant
24  supervision mean?
25          MS. BRUNNER:  Sure.



1    Q.    That an a staff member of some type is able to

2  monitor the inmate continuously 24 hours a day, if

3  necessary.

4    A.    And, again, if necessary, I don't know if I

5  could answer this question.  I think that's for the

6  chief of the psychiatrist to answer that.  I personally

7  am not aware of any in patient unit in the facility.

8    Q.    Okay.  Fair enough.

9          Let's take a 10-minute break.  Off the record.

10          (Off the record.)

11  BY MS. BRUNNER:

12    Q.    Dr. Azizi, I just have a few more questions

13  for you.  I want to go back to the exhibit that we

14  marked as No. 45, which was your psychiatric evaluation

15  of Mr. Morton on January 28th, 2019.

16          Dr. Azizi, who can make a designation that an

17  inmate is going to be confined to a safety cell?

18          MR. ROBERTS:  Objection, calls for

19  speculation, lacks foundation, may call for a legal

20  conclusion.

21          THE WITNESS:  If -- if you don't mind just

22  clarifying a little bit more, like, when you say just

23  what exactly is that, can you provide some explanation?

24          MS. BRUNNER:  Sure.

25    Q.    So if an inmate is going to be confined to a



```
 1   STATE OF CALIFORNIA        )
                                )  ss.
 2   COUNTY OF SAN BERNARDINO   )

 3

 4           I, MARIE WILSON, CSR 13480, a Certified

 5   Shorthand Reporter in and for the State of California,

 6   County of San Bernardino, do hereby certify:

 7           That DR. HAFIZULLAH AZIZI, the witness named

 8   in the foregoing deposition, before the commencement of

 9   the deposition, was duly administered an oath in

10   accordance with CCP 2094;

11           That said deposition was taken down in

12   stenograph writing by me and thereafter transcribed into

13   typewriting under my direction.

14           I further certify that I am neither related to

15   any party to said action, nor in any way interested,

16   financially or otherwise, in the outcome thereof.

17

18           Dated this 8th day of August, 2024.

19

20

21                    

22              MARIE WILSON, CSR NO. 13480

23

24

25
```